COMMONWEALTH of Pennsylvania,
Appellant

v.

Esheem T. HASKINS (at
1963), Appellee.

Commonwealth of Pennsylvania,
Appellant

v.

Jerome King (at 1964), Appellee.

Superior Court of Pennsylvania.

Submitted May 14, 2012.
Filed Oct. 12, 2012.
Reargument Denied Dec. 20, 2012.

.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Janis Smarro, Philadelphia, for Haskins, appellee.

Daniel Silverman, Philadelphia, for King, appellee.

BEFORE: BOWES, LAZARUS and WECHT, JJ.

OPINION BY WECHT, J.:

In this consolidated appeal,[1] the Commonwealth appeals from the Court of Common Pleas' July 5, 2011 order. That order granted the petitions filed by Appellees Esheem Haskins ("Haskins") and Jerome King ("King") pursuant to the Post–Conviction Relief Act ("PCRA"), 42 Pa. C.S. §§ 9541–46, and awarded each of

---

**1.** On May 7, 2012, Appellees, King and Haskins, filed a joint motion to consolidate these appeals. In their motion, King and Haskins note that the Commonwealth does not oppose the request. For these reasons, and because these two cases involve the same underlying facts and legal issue, the motion is granted. The cases are consolidated and jointly disposed of in this opinion.

them a new trial. Following careful review, we reverse.

In King's direct appeal, we quoted the trial court's recitation of the Commonwealth's evidence in this case as follows:

On February 2, 2005, [King] came up from behind Nathaniel Giles (hereinafter, the victim) and, without notice, shot him in the back of the head. Notes of Testimony (hereinafter N.T.) at 6/19/06 at 190. Accompanying [King] was Haskins, who encouraged [King] to "Shoot him. Shoot him." *Id.* at 217. After [King] shot the victim in the head, he stepped over the victim and shot him in the neck. *Id.* at 194. The bullet fired into the victim's head was shot from approximately one foot away and entered through the right ear, and ultimately lodged in the other side of the victim's skull. *Id.* at 129, 132. The second shot was fired approximately two feet from the victim's body. *Id.* at 133. This shot split the victim's cervical spine in two, and also ripped through the victim's jugular vein and carotid artery. *Id.* at 34. The victim was pronounced dead at Temple University Hospital. *Id.* at 126.

On July 15, 2004, approximately six and a half months before he was murdered, the victim had gone to the Philadelphia Office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to speak with Special Agent [Charles] Doerrer about the purchase of a Ruger .45 caliber handgun that had been used to kill Faheem Thomas–Childs.[4] N.T. 6/19/06 at 97–100. The victim was a straw purchaser for his neighbor, [King]. *Id.* at 107, 118. The victim admitted to Doerrer that one of the guns he purchased for [King] was a .45 caliber. *Id.* at 227. In his statement, the victim also admitted that he purchased the gun used to kill Faheem Thomas–

Childs in May of 2003. *Id.* at 105. Subsequently, in March of 2006, [King] admitted to a prison cell-mate, Craig Lindsey, that he had previously owned a gun used by Kennell Spady, one of the men arrested for the Faheem Thomas–Childs murder. N.T. 6/20/06 at 226–227. In fact, Faheem Thomas–Childs was killed by a bullet fired from a .45 caliber gun which was subsequently traced to Giles as the purchaser. *Id.* at 245.

---

4. This was a very high profile case in Philadelphia, involving the killing of a 10 year old child during his morning walk to school. Faheem Thomas–Childs was caught in the crossfire between warring drug dealers and was fatally struck by one of approximately 50 bullets fired that morning.

Earlier in the evening on February 2, 2005, at around 8:30 p.m., S.T. and F.J.[5] entered a Chinese store on the corner of Stillman and Cambria Streets in Philadelphia. *Id.* at 176. Intending to carry out their food, the two girls had to wait as its preparation was not yet complete. *Id.* at 178. As they waited, Ms. T. exchanged pleasantries with the victim, who she knew through another person. *Id.* at 180. Ms. T. then saw the victim leave the store on the corner of Stillman and Cambria Streets and begin to speak with another person, later identified as Khalief Alston. *Id.* at 181; 223. Ms. J. also witnessed the victim and Mr. Alston having a conversation outside the Chinese store. N.T. 6/20/06 at 37.

---

5. At the time of trial, Ms. T. and Ms. J. were aged 14 and 16, respectively. N.T. 6/19/06 at 175; N.T. 6/20/06 at 28. Their full names appear in the certified record.

While waiting for their food, both Ms. T and Ms. J noticed a car drive up Stillman Street to the corner where it intersected with Cambria Street.[6] After the car stopped for an unusually long time, the girls observed it make a left onto Cambria Street. N.T. 6/19/06 at 183–

184; N.T. 6/20/06 at 34–37. Shortly thereafter, both Ms. T. and Ms. J. noticed two males approach the corner of Stillman and Cambria Streets in the direction from which the car they observed had just driven. *Id.* at 186; N.T. 6/20/06 at 39. Each identified these two men as the codefendants. *Id.* at 186; N.T. 6/20/06 at 40, 71.

---

6. Crime scene investigators testified that both the Chinese store and the scene of the crime on the corner of Stillman and Cambria Streets were well lit. N.T. 6/19/06 at 162–163. It was possible to see both into the store, and out of it. N.T. 6/20/06 at 314–318.

As the co-defendants approached the victim from behind, [King] shot him in the head. *Id.* at 188, 190; N.T. 6/20/06 at 39. [King] fired at the victim from a distance close enough to reach out and touch him. N.T. 6/19/06 at 190. In the process of shooting the victim, Ms. T. was able to see Haskins' entire face. N.T. 6/16/06 at 204. Ms. J. saw [King] from the side. N.T. 6/20/06 at 49–50. She also noticed sparks come from the black or silver pistol type gun used by [King]. N.T. 6/20/06 at 59–61. After being shot, the victim instantly fell over. N.T. 6/19/06 at 193; N.T. 6/20/06 at 41. Ms. J. then saw the victim being shot a second time, though she was not sure where this shot struck the victim. N.T. 6/20/06 at 62. As [King] shot the victim, both girls saw Haskins standing nearby. N.T. 6/19/06 at 187; N.T. 6/20/06 at 71. Ms. T. heard him scream to [King], "Shoot him. Shoot him." N.T. 6/19/06 at 217. Though she witnessed only [King] shoot the victim, Ms. J. saw Haskins with a gun.[7] N.T. 6/20/06 at 75.

---

7. At the scene of the crime, police officers found a nine millimeter fired cartridge casing. N.T. 6/20/06 at 243. A nine millimeter, or .38 caliber, bullet specimen was also recovered by the medical examiner from the victim's head. *Id.*

After the shooting, everyone fled the scene of the crime. Ms. T. watched the co-defendants leave together in a car. N.T. 6/19/06 at 194, 209–210. Khalief Alston, with whom the victim was talking prior to being shot, ran up Stillman Street. N.T. 6/19/06 at 207. Startled and frightened for their lives, both witnesses also fled and headed to the home of Ms. T. N.T. 6/19/06 at 207; N.T. 6/20/06 at 47–48. Ms. T. recalled running past the victim and seeing him lying motionless, surrounded by a lot of blood. N.T. 6/19/06 at 208–209. Ms. J. related that Ms. T. had screamed in fear after seeing the shooting and continued to cry throughout the ordeal. [N.T.] 6/20/06 at 48. On their way to the home of Ms. T., the girls were almost hit by the car in which the [co-]defendants were fleeing. *Id.* at 52.

Immediately after the crime, Ms. J. went with her aunt to give a statement to Homicide detectives. *Id.* at 154. She also returned to Homicide on two subsequent occasions. On February 23, 2005, Ms. T. went with her mother to give a statement to Homicide detectives. She also returned to Homicide to provide additional information on two subsequent occasions.[8]

---

8. Ms. T. and Ms. J. both returned to the Homicide Division on March 14, 2005[,] and on April 16, 2005, to provide additional information about the murder they had witnessed. N.T. 6/22/06 at 22, 24, 26–27.

On April 9, 2005, Detective Ron Dove, then of the Central Detectives Division, was working on unrelated matters with his partner, Detective Jim Waring, in the neighborhood where the victim was murdered. Detective Dove spoke with [King]. N.T., 6/20/06 at 170–171. Noticing his "black T-shirt with a red stop sign on it that said 'Stop Snitching' across it," Detective Dove asked him if

the T-shirt was a warning. *Id.* at 175. [King] answered "Yes", and pointed at the top rear of his shirt which revealed a drawing of a tombstone with the letters R.I.P. on it. *Id.* Detective Dove asked him, "Is that what happens to people who snitch on you?" *Id.* He replied, "Yes." *Id.*

Approximately 20 minutes later, at another location in the neighborhood, Detective Dove saw Haskins, in [King's] company, and wearing the same "Stop Snitching" T-shirt. *Id.* at 178–179.

Upon learning that [King] and Haskins were wanted for murder, Detective Dove began looking for them in the neighborhood where the victim was killed. N.T. 6/22/06 at 180. He never again saw them there. *Id.* at 181. On May 6, 2005, based on information provided to the police, Detectives Dove and Waring learned that the co-defendants were staying together in room 312 of a Holiday Inn hotel on City Line Avenue. N.T. 6/20/06 at 182–83. The detectives found the two men in that room and arrested them for the murder of the victim. *Id.* at 184.

*Commonwealth v. King,* 959 A.2d 405, 407–09 (Pa.Super.2008) (citing Trial Court Opinion, 7/18/07, at 1–5).

King called Khalief Alston ("Alston") as a defense witness. Alston, a friend and gang colleague of both King and Haskins, presented a different version of events than that relayed by S.T. and F.J. Alston testified that King and Haskins did not murder the victim. Alston rejected the claim, advanced by S.T. and F.J., that Alston spoke with the victim outside of the Chinese store on the night in question. N.T., 6/21/06 at 144. Rather, Alston claimed that he was walking down the street with Ernest "Ezel" Cannon when they first noticed the victim. Cannon, knowing that the victim was a "snitch," walked up to the victim and shot him in the head from six to eight feet away with a nine millimeter handgun. N.T., 6/21/06 at 103–05, 138–39. Alston testified that, after the shooting, Cannon turned and ran back towards 26th Street, while Alston continued walking towards 25th Street. N.T., 6/21/06 at 105. According to Alston, King and Haskins had no role in the victim's murder. N.T., 6/21/06, at 230, 237–38.

At the time of his trial, Alston also had been charged in two unrelated homicide cases, one attempted homicide case, and two robbery cases. On March 11, 2005, Alston and Cannon were arrested for their joint role in one of those homicide cases. On that date, Alston was interrogated by the police. During that interrogation, the police informed Alston that Cannon had identified him as the actor in at least two murders. After hearing this, Alston identified Cannon as the perpetrator of the murder in the instant case. The Commonwealth seized this opportunity to attack Alston's credibility at trial. The Commonwealth extensively cross-examined Alston regarding his motive to fabricate a story accusing Cannon, a man whom Alston believed lied about Alston's participation in unrelated murders. N.T., 6/21/06, at 228–237. The Commonwealth was able to develop an impression for the jury that Alston created the story implicating Cannon only after learning that Cannon turned on Alston. As the trial court put it, "[a]fter extensive cross-examination on this point, confidence in Alston's story was destroyed and a substantial implication arose that he had merely lied to police and told them Cannon was the shooter in an effort to get back at Cannon." Trial Court Opinion ("T.C.O.(Haskins)"), 11/10/11, at 11.

On June 23, 2006, King and Haskins both were convicted of first-degree mur-

der[2] and criminal conspiracy.[3] King additionally was convicted of carrying a firearm on the public streets of Philadelphia.[4] On the same date, King and Haskins each was sentenced to life imprisonment on the murder conviction, and each received a consecutive twenty to forty-year prison sentence for conspiracy. On the carrying a firearm in Philadelphia count, King was sentenced to a concurrent one to five-year prison term.

Both men appealed to this Court. This Court affirmed King's judgment of sentence, in a published opinion. *King, supra.* King did not seek allowance of appeal with the Pennsylvania Supreme Court. Haskins' judgment of sentence was affirmed in an unpublished memorandum. *Commonwealth v. Haskins,* No. 3303 EDA 2006, slip op., 953 A.2d 599 (Pa.Super. March 12, 2008). Unlike King, Haskins filed a petition for allowance of appeal with the Pennsylvania Supreme Court. The petition was denied on September 9, 2008. *Commonwealth v. Haskins,* No. 197 EDA 2008, 598 Pa. 763, 956 A.2d 432 (Sept. 9, 2008) (per curiam).

On October 9, 2009, King filed a timely *pro se* PCRA petition.[5] On July 2, 2010, after counsel was appointed, King filed an amended PCRA petition raising seven ineffective assistance of counsel ("IAC") claims. In response, the Commonwealth filed a motion to dismiss the PCRA petition. On October 26, 2010, King filed a response to the Commonwealth's motion to dismiss. On January 21, 2011, the trial court held a brief hearing, affording King's counsel the opportunity to argue that King should be granted an evidentiary hearing on his IAC claims. On February 25, 2011, after considering the pleadings and arguments, the PCRA court concluded that King's claims were meritless and issued a notice of intent to dismiss the petition pursuant to Pa.R.Crim.P. 907. On March 11, 2011, King filed an objection to the PCRA court's notice of intent to dismiss.

■ While King's PCRA proceedings were progressing, Haskins independently was seeking PCRA relief as well. Haskins initiated his post-conviction proceedings by filing a timely *pro se* PCRA petition on November 9, 2009.[6] Counsel was appointed to represent Haskins in these proceedings. However, believing that Haskins' claims lacked merit, counsel filed a *Tur-*

---

**2.** 18 Pa.C.S. § 2502(a).

**3.** 18 Pa.C.S. § 903.

**4.** 18 Pa.C.S. § 6108.

**5.** To be timely, a PCRA petition must be filed within one year from the date that the judgment of sentence becomes final. 42 Pa.C.S. § 9545(b)(1). A judgment becomes final "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S. § 9545(b)(3). King did not file a petition for allowance of appeal with the Pennsylvania Supreme Court. Thus, his judgment of sentence became final thirty days (the time period in which he could have sought review with the Supreme Court) after this Court's decision affirming the judg-

ment of sentence, on or about November 17, 2008. King had one year from that date to file a timely petition. He filed his petition on October 9, 2009. Therefore, his petition was timely.

**6.** Unlike King, Haskins filed a petition for allowance of appeal with the Pennsylvania Supreme Court. That petition was denied on November 9, 2008. His judgment of sentence did not become final until ninety days after that date (the time in which Haskins could have sought *certiorari* from the United States Supreme Court), on or about February 9, 2009. To be timely, Haskins' PCRA petition must have been filed within one year of February 9, 2009. Haskins' petition was filed on November 9, 2009. Therefore, it was timely.

*ner/Finley* [7] no-merit letter, and sought to withdraw as counsel. The PCRA court rejected the letter and appointed new counsel for Haskins. On January 4, 2011, counsel amended Haskins' PCRA petition to include a claim that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose a letter written by Alston, who testified for the defense at trial. Although developed at greater length below, we pause here to note the following: to establish a *Brady* violation, a defendant must demonstrate that: (1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. *Commonwealth v. Dennis*, 609 Pa. 442, 17 A.3d 297, 308 (2011).

In the letter, Alston wrote that "cousin Ezel rocked Nate for snitching on lem too." [8] This letter was seized from Alston's home after he was arrested on March 11, 2005, for an unrelated homicide. Thus, the letter was written at some point prior to the statement to police that Cannon shot the victim in this case, not King or Haskins. At trial, the Commonwealth attempted to prove that Alston's claim was untrue by portraying Alston as a liar who concocted the story against Cannon. The Commonwealth bolstered this portrayal by creating the impression that Alston blamed Cannon for the victim's murder only after learning that Cannon blamed Alston for two unrelated murders. N.T. However, the Commonwealth, having Alston's letter in its possession, knew this to be false. Nonetheless, the falsity did not dissuade the Commonwealth from pursuing this line of impeachment.

While his proceedings were ongoing, King learned that Haskins had raised this *Brady* claim. On April 28, 2011, before his PCRA petition could be dismissed, King filed a supplemental amended petition, asserting the same *Brady* issue raised by Haskins. Following additional filings, including two joint filings from King and Haskins briefing the alleged *Brady* violation, a hearing was scheduled for July 5, 2011, for both cases. No testimony was taken at the hearing. Instead, the PCRA court only heard argument from each party.

During the hearing, the Commonwealth revealed that the assistant district attorney ("ADA") in King's and Haskins' case learned before trial that a search warrant was executed on Alston's residence. Aware that Alston would be a defense witness in King's and Haskins' trial, the prosecution requested that the ADA and police officers who were assigned to Al-

---

**7.** *See Commonwealth v. Turner*, 518 Pa. 491, 544 A.2d 927 (1988); *Commonwealth v. Finley*, 379 Pa.Super. 390, 550 A.2d 213 (1988) (*en banc* ).

**8.** In its entirety, Alston's letter reads (verbatim) as follows:

What's the deal, pop? I know I ain't holla at you in a [illegible] I ain't forgot about you at all. You still my oldhead and will be home soon hopefully my way what's been going on with you up there. You don't' ever write me or call my house. My phone number is [ (xxx)xxx-xxxx] and my cell phone number is [ (xxx)xxx-xxxx] so make sure you get at me dog. Boobie funny in shit and he cool in shit. I fucks with him like that I just shot some bull in his eye the other day but that bitchass nigga ain't die but I feel sorry for my next victim. I cousin Ezel rocked Nate for snitching on lem too. So how long do you got before you come home. Shit definitely aint the same out here no more with the cops and niggas ratting like crazy. You know [illegible] in the *FEDS* they picked him up his coce case. He just wrote to Im about to get back at him. I love you dog with all my hearts. Brief for the Commonwealth (Haskins) at 10; Brief for the Commonwealth (King) at 10–11.

ston's separate murder case provide any information pertaining to the instant case obtained during the search. Notes of Testimony ("N.T."), PCRA Hearing, 7/5/2011, at 4–6. The King/Haskins ADA was given Alston's letter. The ADA read the letter and stored it in his trial folders. N.T., 7/5/11, at 7. The ADA never turned the letter over to the defense. The letter did not become known to the defense until Alston provided it to Haskins in prison, at some point after Haskins was convicted. N.T., 7/5/11, at 9.

At the PCRA hearing, the Commonwealth admitted that the ADA should have given the letter to the defense. However, the Commonwealth contended that the failure to do so was an oversight, and that the ADA overlooked the significance of the timing of the seizure of the letter as it related to when Alston first claimed Cannon committed the murder. N.T., 7/5/11, at 8. Despite admitting that the letter should have been disclosed, the Commonwealth nonetheless argued that the letter was discoverable by the defense because Alston was a defense witness. N.T., 7/5/11, at 8–9. Moreover, the Commonwealth maintained that the letter was not material for *Brady* purposes. *Id.* at 17–21.

At the conclusion of the hearing, the PCRA court concluded that the Commonwealth's failure to disclose Alston's letter constituted a material *Brady* violation, particularly because the ADA argued to the jury that Alston fabricated the claim that Cannon committed the murder only after finding out that Cannon blamed him for other murders. N.T., 7/5/11, at 26. Consequently, the court ordered a new trial for both King and Haskins. *Id.*

On July 22, 2011, the Commonwealth filed a notice of appeal in each case. On the same date, the Commonwealth filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On November 8, 2011, the PCRA court filed an opinion pursuant to Pa.R.A.P. 1925(a) rejecting the Commonwealth's assignment of error.

The issue that the Commonwealth asks us to review is stated identically for both King and Haskins:

> Did the PCRA court err in granting [the] defendant a new trial under *Brady v. Maryland* where [the] defendant failed to prove: (a) that the information at issue was unavailable from non-government sources, that he did not know of it, and that he could not have known of it by reasonable diligence; and (b) that the result of the trial would likely have been different had the information been disclosed by the government?

Brief for the Commonwealth (King) at 2; Brief for the Commonwealth (Haskins) at 2.

■ In PCRA cases, our scope and standard of review are well-settled. We are limited to examining whether the court's findings of fact are supported by the record and whether its legal conclusions are free of error. *Commonwealth v. Weiss,* 604 Pa. 573, 986 A.2d 808, 814 (2009).

■ In *Brady,* the United States Supreme Court held that "suppression by the prosecution of favorable evidence to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. *Brady's* mandate is not limited to pure exculpatory evidence; impeachment evidence also falls within *Brady's* parameters and therefore must be disclosed by prosecutors. *U.S. v. Bagley,* 473 U.S. 667, 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). However, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose

evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Id.* at 675, 105 S.Ct. 3375.

 As referenced *supra,* to establish a *Brady* violation, a defendant must demonstrate that: (1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. *Dennis,* 17 A.3d at 308. The burden rests with the defendant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Commonwealth v. Paddy,* 609 Pa. 272, 15 A.3d 431, 451 (2011). The withheld evidence must have been in the exclusive control of the prosecution at the time of trial. No *Brady* violation occurs when the defendant knew, or with reasonable diligence, could have discovered the evidence in question. Similarly, no violation occurs when the evidence was available to the defense from a non-governmental source. *Id.*

 To demonstrate prejudice, "the evidence suppressed must have been material to guilt or punishment." *Commonwealth v. Gibson,* 597 Pa. 402, 951 A.2d 1110, 1126 (2008). Evidence is material under *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the trial could have been different. *Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense." *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1019 (2003) (quoting *U.S. v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). The relevant inquiry is "not whether the defendant would more likely than not have received a differ-

ent verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. To prove materiality where the undisclosed evidence affects a witness' credibility, a defendant "must demonstrate that the reliability of the witness may well be determinative of [the defendant's] guilt or innocence." *Commonwealth v. Johnson,* 556 Pa. 216, 727 A.2d 1089, 1094 (1999).

 "A reviewing court is not to review the evidence in isolation, but, rather, the omission is to be evaluated in the context of the entire record." *Dennis,* 17 A.3d at 309 (citing *Commonwealth v. Small,* 559 Pa. 423, 741 A.2d 666, 675–76 (1999)). When conducting this analysis in the PCRA context, a defendant must establish that the alleged *Brady* violation "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa. C.S. § 9543(a)(2)(i); *Commonwealth v. Copenhefer,* 553 Pa. 285, 719 A.2d 242, 259 (1998).

Initially, the Commonwealth argues that no *Brady* violation occurred. First, because Alston was a defense witness, the Commonwealth posits that reasonable diligence requires defense counsel to ask Alston basic questions, such as, "Did you tell anyone else that Cannon was the shooter?" Brief for the Commonwealth (Haskins) at 16; Brief for the Commonwealth (King) at 16. Had counsel performed this minimal amount of diligence, the letter would have been discovered. The Commonwealth explains that, because this did not happen, no *Brady* violation occurred. *Id.* Second, the Commonwealth observes that the letter was not in the exclusive control of the Commonwealth. Indeed, the ADA assigned to Alston's murder case turned the letter over to Alston's defense attorney.

Brief for the Commonwealth (Haskins) at 15; Brief for the Commonwealth (King) at 15. According to the Commonwealth, the letter was available from a nongovernmental source and was not subject to *Brady's* mandate. The Commonwealth's arguments in these particulars are unpersuasive.

■ The Commonwealth maintains that, because Alston was a defense witness, the defense could have learned of the letter's existence with minimal questioning and reasonable diligence. Neither the parties nor the PCRA court have identified any Pennsylvania cases addressing how far defense counsel must go in questioning its own witnesses to obtain information that is already in the Commonwealth's possession in order to satisfy *Brady's* diligence requirement. Our own research similarly has not yielded any Pennsylvania cases that are factually on-point.

■ In resolving this issue, the PCRA court relied upon *Boss v. Pierce,* 263 F.3d 734 (7th Cir.2001). While not binding on this Court, we find the case persuasive, and we adopt its rationale.[9] In *Boss,* a defense witness met with a state investigator a few days before trial began. The witness provided the investigator with exculpatory evidence. The prosecution did not reveal this exculpatory information to the defense until the final day of trial. *Id.* at 737–38. The exculpatory information identified another witness who could have provided additional information favorable to the defense. The defense sought a continuance of the trial in order to locate that witness. The trial court denied the request. Thereafter, Boss was convicted of first-degree murder and robbery. *Id.* at 738.

On *habeas corpus* review, the U.S. Court of Appeals for the Seventh Circuit weighed Boss' claim that the government committed a *Brady* violation by failing to disclose the investigator's report containing the exculpatory information. Because the information was derived from a defense witness, the prosecution, like the Commonwealth in the case *sub judice,* argued that the defense "had ample access to any information [the witness] possessed." *Id.* at 740. The court of appeals squarely rejected this argument. Because of the similarities in the arguments between *Boss* and the instant case, we reproduce the federal court's analysis on this point in full:

> [T]he state's argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence. We regard as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes. To begin with, it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses. Sometimes, a defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement. Or, as may have been the case here, the defense witness learned of certain evidence in the time between when she spoke with defense counsel and the prosecution.
>
> Putting aside these situations in which it would be nearly impossible for defense counsel to discover evidence in the possession of defense witnesses, accepting

<hr>

**9.** We "recognize ... that the holdings of federal circuit courts bind neither this Court nor the trial court, but may serve as persuasive

authority in resolving analogous cases." *Montagazzi v. Crisci,* 994 A.2d 626, 635 (Pa.Super.2010) (citation omitted).

the state's position would place a burden on defense counsel that goes far beyond what reasonable diligence demands. Defense counsel can certainly be expected to ask witnesses (defense and otherwise) questions relevant to what counsel understands to be the witness's role in the case. However, defense counsel cannot be expected to ask questions about matters completely unrelated to the witness's role in the case. A contrary conclusion would require defense counsel to conduct a fishing expedition with every defense witness (and potential defense witnesses). Reasonable diligence does not require such a practice. We also find it significant that a defense witness's knowledge is quite different from the type of evidence typically found to be available to defense counsel through the exercise of reasonable diligence. In the typical reasonable diligence case, the question is whether defense counsel had access to the document containing the *Brady* material, through an open file policy, for example. In cases like the present one, the question is whether defense counsel had access to *Brady* material contained in a witness's head. Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document. But, the position the state advances would require a defense witness's knowledge to be treated exactly as information in a document the defense possesses. This stretches the concept of reasonable diligence too far.

*Id.* at 740–41.

Instantly, the Commonwealth asks us essentially to require defense counsel to engage in the same "fishing expedition" and "mind-reading" that the *Boss* Court rejected. For the same compelling rea-

sons enumerated in *Boss,* we decline to do so. Defense counsel cannot reasonably be expected to ask every conceivable question of its witnesses, particularly when there is no identifiable reason for counsel to know or believe that additional evidence exists. Instantly, defense counsel had no reason to believe that Alston possessed an unsent letter identifying Cannon as the murderer. Furthermore, counsel did not have cause to believe that anything relevant to King or Haskins' case was seized following the execution of a search warrant on Alston's residence. Reasonable diligence simply does not extend this far.

As to the Commonwealth's second argument, we note that, typically, no *Brady* violation occurs when the undisclosed evidence is discoverable or obtainable through a non-government source. *See Paddy, supra; Commonwealth v. Tedford,* 598 Pa. 639, 960 A.2d 1, 30 (2008). Here, the letter technically was available to the defense through a non-governmental source: Alston's trial lawyers. However, neither King, Haskins, nor their attorneys knew that the letter existed. As we did with respect to the Commonwealth's first argument, we conclude that it is unreasonable to place upon the defense the burden to obtain evidence that it did not know existed, from a source, even if a non-governmental source, that the defense did not know possessed the evidence. The fact that the Commonwealth turned the letter over to Alston's trial attorney did not relieve the Commonwealth of its burden to disclose it to King and Haskins in an unrelated case.

There is no doubt that the Commonwealth violated its *Brady* duty when it failed to turn Alston's letter over to the defense. The Commonwealth conceded that the letter was in its possession, that the ADA assigned to King's and Haskins' case read the letter, and that the ADA

knew that Alston would be a defense witness at trial. This dereliction cannot be excused by a lack of diligence on the part of the defense under these circumstances.

At the PCRA hearing, the Commonwealth conceded that it should have turned the letter over, but maintained that this was an oversight due to the trial ADA's failure to recognize the significance of the timing of when the letter had to be written. Whether intentional or inadvertent, the violation permitted the ADA to create the false impression at trial that Alston fabricated the claim that Cannon murdered the victim only after learning that Cannon fingered him for at least two other murders. When constructing this narrative, the Commonwealth, having read the letter, knew or should have known that this line of attack on Alston's credibility could have been impeached by reference to the letter in its possession.

■ Deceitful as this trial tactic may have been, or as careless as the oversight may have been, King and Haskins are not automatically entitled to relief. We still must determine whether the letter was material, *i.e.*, whether there is a reasonable probability that the verdict would have been different had the Commonwealth properly discharged its duties. *Kyles, supra.* In this case, the materiality assessment requires consideration of whether, had the defense been in possession of Alston's letter at trial, Alston's credibility would have been rehabilitated to such a degree that the outcome of the trial would have been different. In conducting this analysis, we are mindful that "[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create

reasonable doubt." *Copenhefer,* 719 A.2d at 259 (Pa.1998) (citing *Commonwealth v. Green,* 536 Pa. 599, 640 A.2d 1242, 1245 (1994)). In light of the overwhelming evidence of guilt in this case, we are constrained to conclude that the trial court committed an error of law in finding that the letter was material for *Brady* purposes.

■ At trial, S.T. and F.J. testified that they were inside the Chinese store on the day of the victim's murder waiting for the food that they had ordered. From inside the store, and through a glass storefront, S.T. and F.J. both observed Alston talking to the victim on the street outside of the store. As this conversation was occurring, a dark vehicle appeared on Stillman Street. According to S.T. and F.J., the vehicle idled at a stop sign for an unusually long period of time. Eventually, the vehicle made a left turn onto Cambria Street. Shortly thereafter, two men appeared from the Cambria Street direction. While Alston was talking to the victim, these two men approached the victim from the rear. When the men appeared, Alston ran off.

One of the men yelled, "Shoot him. Shoot him." S.T. and F.J. observed the other man shoot the victim in the back of the head. The victim fell to the ground immediately. The shooter stood above him and shot him a second time. S.T. and F.J. watched the assailants run back towards Cambria Street, enter the same vehicle in which they arrived, and drive away.

S.T. and F.J., both disinterested witnesses without a discernible motive to be untruthful, identified King as the shooter and Haskins as the man who yelled, "Shoot him. Shoot him." On February 23, 2005, nearly three weeks after the murder, S.T. selected Haskins from a photo array. N.T., 6/19/06, at 217–18. On

March 14, 2005, she identified Alston from a photo array as the person who was standing with the victim immediately prior to being shot. N.T., 6/19/06, at 223–24. Finally, on April 16, 2005, S.T. selected King's photo from a book containing a total of ninety-seven photographs. N.T., 6/19/06, at 226–27. S.T. also unequivocally identified both King and Haskins at trial. N.T., 6/19/06, at 186–188. S.T.'s identification of King and Haskins was bolstered by the fact that she was familiar with both men from the neighborhood, and had seen them in that neighborhood before and after the killing. N.T., 6/19/06, at 224–27.

F.J. initially refused to identify the actors that she observed murder the victim. F.J. testified that she declined to do so because she knew King from the neighborhood and was afraid to identify him. N.T., 6/20/06 at 57, 68, 82–84. However, like S.T., F.J. eventually identified King, Haskins, and Alston from various photo collections and arrays. N.T., 6/20/06, at 70–79. F.J. also identified King and Haskins at trial. N.T., 6/20/06, at 40, 71.

Bennett G. Preston, M.D., of the Philadelphia Medical Examiner's Office, performed an autopsy on the victim. N.T., 6/19/06, at 124. Dr. Preston examined the gunshot wound to the victim's head. Based upon the abrasions formed on the skin caused by burning gunpowder (stippling), Dr. Preston estimated that the gun that killed the victim was fired from within two feet of the victim's head. N.T., 6/19/06, at 131. Dr. Preston explained that this was a maximum distance between the gun and the head, but opined that "it was more than likely a lot closer than that, maybe a foot." N.T., 6/19/06, at 132. Dr. Preston's expert opinion corroborated S.T.'s testimony that King was close enough to touch the victim when King fired the gun. N.T., 6/19/06, at 190.

The Commonwealth also introduced evidence that both King and Haskins' were wearing "Stop Snitching" t-shirts in the neighborhood in the months following the murder. King even admitted that the shirt represented a threat, and that people who snitched on him ended up dead. N.T., 6/20/06, at 170–71, 175–79. While this evidence may be innocuous by itself, the shirts substantiated for the jury the motive ascribed to King and Haskins by the Commonwealth, which was that the victim was killed in retaliation for being an informant for the ATF.

Alston was the only witness presented by the defense. Alston testified to a series of events quite different from those testified to by S.T. and F.J. Alston testified that he was walking with Cannon on the side of the street opposite the spot where the victim was standing. Cannon walked over to the victim. Alston stated that Cannon, acting alone, walked up to the victim and shot him twice with a nine millimeter handgun. According to Alston, he and Cannon left the area on foot, not in a vehicle. Alston estimated that Cannon was six to eight feet away from the victim when he fired the fatal shots. N.T., 6/21/06 at 103–05, 138–39. Alston emphatically declared that King and Haskins were not the victim's murderers. N.T., 6/21/06, at 230, 237–38.

Reviewing the evidence in its totality, we cannot conclude that, had the Commonwealth turned the letter over to the defense, there is a reasonable probability that the jury would have acquitted King and/or Haskins. Both men were unequivocally identified on more than one occasion by S.T. and F.J. Both knew the men from the neighborhood and were able to get a clear view of their faces as they executed the victim on the street. S.T. and F.J. testified that the two men arrived in a vehicle, parked it on Cambria Street, and

then fled in the same vehicle after the murder. S.T.'s testimony was corroborated further by the medical examiner's testimony that the shot likely was fired from approximately one foot away.

At the time of trial, Alston was facing two murder cases, an attempted murder case, and two robbery cases. Each case involved the violent use of a firearm. Alston was a member of the "Lemon Squad," a gang led by King. Haskins also was a member of the "Lemon Squad." Alston admitted his loyalty to King and Haskins. N.T., 6/21/06, at 228. His motive to fabricate his testimony was clear. Alston's testimony substantially differed from that of S.T. and F.J. Alston claimed there was only one actor near the victim when he was shot. S.T. and F.J. testified that two men approached the victim. Alston alleged that Cannon, after murdering the victim, fled on foot. S.T. and F.J. consistently testified that the actors fled to the vehicle in which they had arrived, and used that vehicle to flee the scene.

Among the credibility issues readily apparent with Alston, and arguably the most damning, was his declaration that the shot was fired from six to eight feet away. Dr. Preston, an expert in forensic pathology, opined that, based on the forensic evidence left on the victim's head, the shot was fired from at most two feet away. However, Dr. Preston believed that it was more likely that the shot was fired from only one foot away. Alston's testimony was not only impeached by the divergence of his version of events from the versions of S.T. and F.J.; it also was contradicted by the forensic evidence in the case.

Based upon the consistency and strength of the Commonwealth's case, it is clear that, had the defense been in possession of the letter, Alston's credibility would not have been rehabilitated to the point of overcoming the clear and consistent testimony of the two disinterested witnesses and the supporting physical evidence. While the jury was given the impression that Alston fabricated the story against Cannon only after finding out that Cannon fingered Alston, the overwhelming evidence in this case compels our conclusion that the jury would not have reached a different verdict had Alston been rehabilitated with the letter, or if the Commonwealth never pursued that line of questioning.

Accordingly, Alston's letter was not material for *Brady* purposes. The PCRA court erroneously found otherwise. The PCRA court's order granting King and Haskins a new trial is reversed. Jurisdiction relinquished.

BOWES, J., files a Concurring Opinion.

CONCURRING OPINION BY
BOWES, J.:

I agree with the distinguished majority that Appellees cannot establish actual prejudice and that the PCRA court erred in granting them a new trial. In addition, like the majority, I am distressed by the Commonwealth's disregard for the rules of discovery in failing to turn over the document in question and forwarding an argument during trial that it knew or reasonably should have known was disingenuous. However, I do not join the majority's adoption of *Boss v. Pierce,* 263 F.3d 734 (7th Cir.2001), under the precise facts of this case.

In *Boss,* the state's key witness testified that the defendants therein were part of a group that robbed and beat to death a fifty-two-year-old man. That same witness, however, had apparently admitted to committing the crime himself to a defense witness. That defense witness informed law enforcement of the admission four days before trial. The prosecution failed to disclose the investigative report contain-

ing this information until the last day of trial. Defense counsel's motion for a continuance on this basis was denied. The defense witness whose statement was at issue had been called by the defense to offer testimony to corroborate an alibi witness's testimony, and defense counsel was unaware that the witness had material exculpatory and impeaching evidence prior to the prosecution's late disclosure.

Instantly, the defense witness had written a letter before he had a motive to accuse a different individual of committing the murder and the letter was within the witness's attorney's possession. The critical issue presented, therefore, is whether Appellees' lawyers who were unaware of the letter, reasonably had access or could have discovered the letter where it was not in the exclusive control of the prosecution. The majority's holding finds it unreasonable for defense counsel to ask his own witness or that witness's counsel for evidence that supports the very testimony he will offer at trial and would counter any inference that the witness was offering the evidence to extract revenge on the person he was accusing of committing the crime.

Unlike *Boss*, the letter in question was directly related to the witness's role in the case, *i.e.*, his testimony that another person committed the shooting and whether he had consistently maintained such a position. Additionally, the document itself, unlike the report in *Boss*, was available through a non-governmental source.[1] In my view, the discovery violation herein, while troubling and deserving of some sanction, does not rise to the level of a constitutional *Brady* violation. As the *Boss* decision itself highlights, "Defense counsel can certainly be expected to ask witnesses (defense and otherwise) questions relevant to what counsel understands

to be the witness's role in the case. However, defense counsel cannot be expected to ask question about matters **completely unrelated** to the witness's role in the case." *Boss, supra* at 740 (emphasis added).

Appellees' attorneys specifically were calling the witness in question to identify another party as the killer and should have been aware of the potential that the Commonwealth intended to call that testimony into question by highlighting that the person he accused of committing the crime had identified him as a murderer in two other cases. Asking this witness about the testimony he was expressly being called to relate and whether he had continually asserted this position does not involve mind reading or a fishing expedition. *Cf. Boss, supra* at 741. Thus, I agree with the Commonwealth that such an inquiry was reasonable, and that since defense counsel for the witness had the letter in his possession, Appellees had access to the document from a non-governmental source. Accordingly, I cannot agree with the majority that we should adopt the rationale in *Boss* as applied to the facts in this matter. Phrased differently, since the withheld evidence was not within the exclusive control of the prosecution at the time of trial and Appellees could have discovered the evidence by exercising reasonable diligence, no *Brady* violation occurred.

With this *caveat* in mind, I join the learned majority in reversing the PCRA court's award of a new trial, and would strongly caution the Commonwealth against blatant disregard of the discovery rules.

---

1. The state in *Boss* argued that the information contained in the report, not the report itself, was available through a non-governmental source, *i.e.*, from the witness's own head.