**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2118
_____

ESHEEM T. HASKINS,
                              Appellant

v.

SUPERINTENDENT GREENE SCI; THE DISTRICT ATTORNEY OF THE COUNTY
OF PHILADELPHIA; THE ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA


_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:13-cv-06901)
District Judge: Hon. John R. Padova
_____

Argued October 2, 2018
_____

Before: SHWARTZ, ROTH, and FISHER, Circuit Judges.

(Opinion Filed: November 8, 2018)


_____

OPINION*
_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

Carole L.. McHugh [ARGUED]
410 Old York Road
Jenkintown, PA 19046-2809

    *Counsel for Appellant*

Catherine B. Kiefer [ARGUED]
Assistant District Attorney
Three South Penn Sq.
Philadelphia, PA 19107-3499

    *Counsel for Appellee*


PER CURIAM

Esheem Haskins appeals the District Court's order denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Haskins v. Folino, Civ. No. 13-6901, 2017 WL 1397261 (E.D. Pa. Apr. 19, 2017). Because the Superior Court unreasonably applied Brady v. Maryland, 373 U.S. 83 (1963), we will vacate the order denying him § 2254 relief.

I

A

On the night of February 2, 2005, Nathaniel Giles was shot to death outside of a restaurant in Philadelphia. In May 2005, police arrested Jerome King and Haskins in connection with the shooting. Prosecutors argued that King and his fellow gang member Haskins wanted Giles dead after they found out that Giles had told authorities that he had purchased a gun for King that was later used in a high-profile murder.

At trial, the prosecution relied chiefly on the testimony of two teenage eye-witnesses, S.T. and F.J., who were present for the murder and had a clear vantage point

2

from inside the restaurant.  S.T. and F.J. testified that they went to the restaurant together to pick up food.  Upon entering, S.T. briefly greeted the victim, Giles, who was an acquaintance, and then S.T. and F.J. observed a person whom they later identified as Khalief Alston talking to Giles in front of the restaurant.  While waiting for their food, S.T. and F.J. saw a car stop for an unusually long time at the stop sign in front of the restaurant and then pull away.  A short time later, two men, coming from the direction where the car had driven, approached Giles from behind.  One pulled out a pistol.  That man, S.T. and F.J. said, raised his weapon to the back of Giles' head and opened fire from a distance close enough to touch Giles.  Giles fell to the sidewalk.  The shooter then stood over Giles and shot him again.  The shooter and his accomplice fled the scene.

S.T. and F.J. consistently identified King as the shooter and Haskins as his accomplice, in the photo arrays they viewed during the investigation and at trial.  The physical evidence also corroborated S.T. and F.J.'s account of the first shot, which placed the shooter right behind Giles.[1]

Before testifying at trial, F.J. made statements to police that were inconsistent with some of her trial testimony.  In her first statement to police, F.J. did not mention an accomplice.  In addition, F.J. described the shooter as being between 6'0" and 6'3", while King is 5'7", and at trial she denied providing the detectives with the shooter's height.[2]

---

[1] The Medical Examiner testified, based on the gun powder burns around Giles' gunshot wounds, that the initial shot was fired no more than two feet away, and probably closer than that.

[2] The alternate suspect that the defense put forward, Ernest Cannon, does not match F.J.'s purported height description either.

3

S.T. also testified inconsistently on a few occasions. For example, S.T. first testified that Haskins handed a gun to King as they approached, but later testified that she did not see Haskins handle a firearm. In addition, she initially testified that she heard Haskins yell "Shoot him. Shoot him" to King in the moments before King opened fire on Giles, but later testified that she could not recall what he said and also said that she could not hear what was being said outside the restaurant.

The two witnesses were also inconsistent with each other. For instance, S.T. testified that she heard four or five gun shots, whereas F.J. testified to hearing only two. In addition, F.J. and S.T. were inconsistent in their accounts of the aftermath of the shooting, with F.J. testifying that she saw King and Haskins flee on foot, before almost being hit by a car, while S.T. equivocated as to whether the men fled by car or on foot.

The defense's strategy rested on impeaching these witnesses with their prior statements as well as presenting Alston's testimony. Alston testified that, on the evening of the shooting, he was walking down the sidewalk across the street from the restaurant with his friend Ernest Cannon. He said that Cannon saw Giles, crossed the street, and shot Giles because of his reputation for "snitch[ing]." App. 519-21. Alston testified that Cannon fired a nine millimeter pistol at Giles from a distance of six to eight feet, and that Giles dropped to the ground, Cannon advanced, fired one more round from directly above Giles, and fled.

On cross-examination, the prosecution established that Alston was a member of the same gang as King and Haskins. Alston testified that he had been friends with King and Haskins from an early age, and was loyal to them. The prosecution further

4

established that Alston had a total of five pending criminal trials, and one prior conviction for a theft-related offense. Finally, the prosecution advanced the theory, both through questioning and in its closing, that Alston accused Cannon of Giles's murder only because Alston found out, just prior to his statement to police inculpating Cannon, that Cannon had told police that Alston had committed a separate murder, thereby suggesting that Alston's identification of Cannon as Giles's murderer was a recent fabrication.

The jury found King and Haskins guilty of first-degree murder and criminal conspiracy. See Commonwealth v. Haskins, 60 A.3d 538, 543-44 (Pa. Super. Ct. 2012). The Pennsylvania Superior Court affirmed, and the Pennsylvania Supreme Court denied review as to Haskins' petition. Id. at 544.

Haskins later learned that the Commonwealth failed to turn over a letter from Alston, apparently written to someone with whom Alston has a close personal relationship, in which Alston identified Cannon as Giles's murderer, stating that "cousin Ezel [Cannon] rocked Nate for snitching on lem [King] too." App. 134; Haskins, 60 A.3d at 545 n.8. Importantly, this letter predated Alston's meeting with police, where Alston said that Cannon killed Giles after learning that Cannon had accused Alston of an unrelated murder. Haskins, 60 A.3d at 545. Haskins asserts that the letter would have undermined the prosecution's theory that Alston accused Cannon of Giles's murder as revenge for accusing Alston of murder, lending credibility to Alston's identification of Cannon as Giles's murderer.

5

B

Haskins filed a pro se petition seeking relief under the Post-Conviction Relief Act ("PCRA"). 42 Pa. Cons. Stat. § 9541 et seq.; Haskins, 60 A.3d at 544. Haskins's appointed counsel filed an amended PCRA petition alleging that the Commonwealth's failure to disclose the letter violated Brady v. Maryland, 373 U.S. 83 (1963). Haskins, 60 A.3d at 545. During the PCRA hearing, the Commonwealth admitted that the prosecutor had received the letter before trial but failed to turn it over to the defense. Id. at 545-46. The PCRA court held that the letter was material and the Commonwealth therefore violated Brady, and that Haskins was entitled to a new trial. Id. at 546. The Pennsylvania Superior Court reversed, holding that although the prosecution withheld evidence that would have aided Haskins, it was not material under Brady. Id. at 552. The Pennsylvania Supreme Court denied review. Commonwealth v. Haskins, 78 A.3d 1090 (Pa. 2013) (Table).

Haskins filed a petition in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 2254. The Magistrate Judge recommended that Haskins's petition be dismissed. Haskins v. Folino, Civ. No. 13-6901, 2016 WL 8740477, at *10 (E.D. Pa. July 12, 2016). The District Court adopted the Magistrate Judge's findings and recommendation, holding that the Pennsylvania Superior Court had correctly articulated and applied Brady, and that Haskins was not entitled to habeas relief. Haskins, 2017 WL 1397261, at *6, 12. Haskins appeals.

6

## II[3]

## A

When a district court denies a habeas petition without an evidentiary hearing, our review of its order is plenary. Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009). When a state court adjudicates a petitioner's claim on the merits, we apply the same standard of review as the district court. Blystone v. Horn, 664 F.3d 397, 416-17 (3d Cir. 2011).

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas court may not grant relief with respect to any claim that the state court adjudicated on the merits unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Thus, § 2254(d) embodies "three distinct legal inquiries." Blystone, 664 F.3d at 417. "First, we must inquire whether the state court decision was 'contrary to' clearly established federal law, as determined by the Supreme Court of the United States." Id. (internal quotation marks omitted). "[S]econd, if it was not, we must evaluate whether the state court judgment rests upon an objectively unreasonable

---

[3] The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. This Court has jurisdiction under 28 U.S.C. §§ 1291, 1331, and 2253. We issued a certificate of appealability as to Haskins's Brady claim, and we therefore have jurisdiction to review only that issue. 28 U.S.C. § 2253(c)(1)(A); 3d Cir. L.A.R. 22.1(b).

application of clearly established Supreme Court jurisprudence." Id. (internal quotation marks and alterations omitted). "Third, we must ask whether the state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court." Id. (internal quotation marks omitted).

B

1

At oral argument, Haskins withdrew reliance on any argument that the state court decision contradicted the law set forth in Supreme Court precedent. Thus, we consider whether the Superior Court's judgment rests upon an "objectively unreasonable application" of clearly established Supreme Court jurisprudence. See Williams v. Taylor, 529 U.S. 362, 367 (2000). Because our decision can be reached on this second factor alone, we do not provide a detailed analysis as to whether the Superior Court's decision rested on an unreasonable application of facts to the law.

Under the "unreasonable application" prong of § 2254(d)(1), the reviewing court may not grant relief unless the state court's adjudication involved an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). "A state court decision is objectively unreasonable if the state court identifies the correct governing principle from th[e Supreme] Court's decision [] but unreasonably applies that principle to the facts of the prisoner's case." Blystone, 664 F.3d at 417 (alterations in original) (citing Williams, 529 U.S. at 413). Under this standard, "it is the habeas applicant's burden to show that the state court applied [federal case law] to the facts of his case in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25

8

(2002). Put differently, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Blystone, 664 F.3d at 417-18 (quoting Harrington v. Richter, 562 U.S. 86, 101 (2011)). Here, therefore, we must decide whether fairminded jurists could disagree on the correctness of the Superior Court's Brady ruling.

2

Brady requires the prosecution to turn over evidence favorable to the accused where the evidence is material to either guilt or punishment, 373 U.S. at 87, including evidence that would affect the credibility of a witness, Wilson v. Beard, 589 F.3d 651, 659, 666-67 (3d Cir. 2009). This rule requires disclosure of information actually known to the prosecution and "all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution." Id. at 659. "A Brady violation occurs if: (1) the evidence at issue is favorable to the accused, because [it is] either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" Breakiron v. Horn, 642 F.3d 126, 133 (3d Cir. 2011) (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Wilson, 589 F.3d at 659). The Commonwealth concedes that the first and second prongs of Brady are met, admitting that the letter was favorable to Haskins and was withheld by the prosecution.

As to the third prong, the "touchstone of materiality is [whether presentation of the suppressed evidence at trial would have created] a 'reasonable probability' of a different result." Kyles v. Whitley, 514 U.S. 419, 434 (1995). "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines

9

confidence in the outcome of the trial.'" Id. (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). In other words, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id.

C

Haskins's claim that the state court's evaluation of his Brady claim involved an "unreasonable application" of established federal law under § 2254(d)(1) has merit. Although the Superior Court correctly articulated the standard for materiality, it required Haskins to demonstrate more than the law requires. For instance, the Superior Court correctly observed that "[e]vidence is material under Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the trial could have been different." Haskins, 60 A.3d at 547 (citing Kyles, 514 U.S. at 433-34); see also id. at 550 ("We still must determine . . . whether there is a reasonable probability that the verdict would have been different had the Commonwealth properly discharged its duties." (citing Kyles, 514 U.S. at 434)). However, after an in-depth discussion of the evidence presented at trial, the court held as follows:

> Reviewing the evidence in its totality, we cannot conclude that, had the Commonwealth turned the letter over to the defense, there is a reasonable probability that the jury would have acquitted King and/or Haskins.

Id. at 551. Thus, in applying the Supreme Court's materiality standard, it required Haskins to show the jury would have acquitted him, rather than showing there is a reasonable probability that "the result of the proceeding would have been different."

10

Turner v. U.S., 137 S. Ct. 1885, 1893 (2017) (quoting Cone v. Bell, 556 U.S. 449, 469-70 (2009)). A different outcome includes not only an acquittal, but also a hung jury or a verdict on a lesser included offense. Id. at 1897 (Kagan, J, dissenting); McCray v. Capra, No. 9:15-cv-01129, 2018 WL 3559077, at *4 (N.D.N.Y. July 24, 2018). Thus, the application of Brady requires consideration of not just whether the letter would have resulted in an acquittal.

Furthermore, given that the suppressed letter contained direct evidence going to a central issue in this case, the jury's lack of access to it causes us to question whether the verdict is worthy of confidence. Kyles, 514 U.S. at 434. The Commonwealth presented two disinterested witnesses who implicated Haskins in the murder. Portions of their trial testimony were inconsistent with their earlier statements to the police and with aspects of either their own or each other's testimony. Even though the two witnesses were disinterested and, as Haskins concedes, neither had a motive to lie, a compelling alternate version of events, presented with corroborating evidence, might have cast doubt on their accounts. Alston's testimony provided such an alternative. Alston testified that Cannon shot Giles and neither Haskins nor King was present. **App. 628-29.**

Alston's credibility was vigorously attacked on multiple fronts. He was confronted with his five pending trials, his prior juvenile adjudication for possession of stolen property, and his admitted loyalty to and bias in favor of Haskins. Moreover, in response to Alston's testimony that Cannon and not King shot Giles, the prosecutor asserted through his questioning that Alston fingered Cannon for Giles's murder in retaliation for Cannon having implicated Alston in a separate murder. Put plainly, the

11

prosecution sought to suggest to the jury that Alston's testimony blaming Cannon was a recent fabrication made in retaliation for Cannon's then recent disclosure of Alston's role in another murder.

The Brady material here would have corroborated Alston's testimony, undercutting that challenge. The letter identifying Cannon as Giles's killer was written before Cannon's statements to police implicating Alston in a murder. Thus, even before a retaliatory motive may have existed, Alston said Cannon shot Giles. Had the letter been disclosed, the prosecutor would have been unable to pursue the recent fabrication challenge, and if he attempted to do so, Haskins could have easily refuted that accusation by pointing to his letter to someone with whom he shared a close relationship, written before the alleged motive to retaliate against Cannon arose. Given the importance of Alston's credibility and the inconsistencies in the testimony of the prosecution's witnesses, we believe that there is no room for fair-minded disagreement that the letter calls into question whether the verdict returned is "worthy of confidence." Kyles, 514 U.S. at 434. As a result, the Superior Court unreasonably applied Brady and its progeny when it held that the evidence was not material. Haskins is therefore entitled to habeas relief.

### III

For the foregoing reasons, we will reverse the District Court's order denying Haskins's habeas petition, and the Commonwealth is directed to retry Haskins within 120 days or release him.

12