J-S69011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL CHRISTOPHER ROMIG, | |
| Appellant | No. 400 MDA 2018 |

Appeal from the Judgment of Sentence Entered February 5, 2018
In the Court of Common Pleas of Mifflin County
Criminal Division at No(s): CP-44-CR-0000560-2016

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MURRAY, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED DECEMBER 17, 2018**

Appellant, Michael Christopher Romig, appeals from the judgment of sentence of 9½ to 30 years' incarceration, imposed after he was convicted by a jury of two counts of aggravated assault and one count of simple assault. After careful review of the issues Appellant raises herein, we affirm.

The Commonwealth summarized the evidence it presented at Appellant's jury trial, as follows:

> On the evening of August 2, 2016, Kelly McTavish was only familiar with [Appellant] … as an acquaintance.  Kelly McTavish was also friends with Patricia Koch (hereinafter "Koch") and was "seeing" the victim, James Barry Moore (hereinafter "Moore["]), having  lived with him for about four or five months.  Kelly McTavish indicated both Moore and Koch lived in a multiple[-] dwelling apartment building in Lewistown, and that Moore at that point in time didn't have any significant health issues.  Kelly McTavish testified that she, along with Koch, Moore and [Appellant] went to [Appellant's] residence in McClure, PA[,] on the evening of August 2, 2016.  Kelly McTavish testified she was

sitting on the couch in [Appellant's] residence alongside Moore when [Appellant] sat beside her and began showing her naked pictures of himself on his cell phone as she was seated next to Moore. Kelly McTavish testified [that] Moore advised [Appellant] this was not appropriate behavior. Then[,] while Moore was still seated on the couch[,] [Appellant] became angry and [Appellant] punched Moore in his face with a closed fist, a punch described as a "sucker punch" by Kelly McTavish. Kelly McTavish further testified Moore did not retaliate in any way after being struck in the face by [Appellant] with a closed fist. McTavish further testified [Appellant] grab[bed] Moore by his shirt and drag[ged] him off the couch and then start[ed] kicking him in the head and chest wearing steel[-]toed work boots. As Moore [was] being kicked by [Appellant], McTavish related [that] she observed that Moore's face had already started to swell, he was bleeding from his nose, bleeding from his ears, was not responding or saying anything, just making grumbling noises. McTavish testified there was a lull from this assault when she went upstairs to wake her friend Koch[,] who had been upstairs taking a nap[,] and when she came back down with Koch, [Appellant] continued kicking Moore in the head, in the chest, and in the back multiple times. McTavish indicated Moore was unable to defend himself in any way at this point in time, nor did he take any aggressive action toward [Appellant]. [Appellant] then retrieved a knife, put the knife by Moore's neck, saying[,] "I'm just going to end it now[,]" [with] the knife being not even an inch away from Moore's neck. McTavish testified [that] Moore had blood all over his face at this point, appeared to be unconscious, and was carried from the residence to the back seat of Koch's vehicle where he was transported to Lewistown Hospital. McTavish further testified Moore was never on his feet again that evening, from the time he sat down on the couch until he was carried out to the back of the car after the assault occurred. She further indicated there were no arguments, that [Appellant] was yelling[,] and that Moore was not arguing with [Appellant].

Koch testified at trial[] [that] she lived in the same building as Moore[,] whom she had a brotherly relationship with. She further knew Kelly McTavish through James Moore and knew they dated on and off. She … recalled all parties met on the evening of August 2, 2016[,] at the Steelworker Bar and then drove to [Appellant's] residence. She testified that at some point during the evening, she got a migraine and went upstairs to lay down, leaving [Appellant], McTavish[,] and Moore downstairs. When she

next came down, she saw [Appellant] punching and stepping on Moore. She further clarified [Appellant's] assault continued on Moore[,] with [Appellant's] "stomping" on Moore's head and body[,] with Moore unable to defend himself at that point. Koch observed Moore bleeding from his ears, his nose, his eyes and he was unresponsive. Koch then observed [Appellant] get a knife, put it to the throat of Moore and say he was going to kill him. Koch testified she responded to [Appellant's] statement by saying[,] "What are you gonna kill him for? He's already dead." Koch testified[] [that] she never saw Moore offer any resistance or fight back against this assault by [Appellant]. Koch thought the victim was dead at this point with blood coming out everywhere there could be[,] and [she] eventually convinced [Appellant] to help carry Moore out to the car for transport to the hospital.

Moore testified he resided in Burgard Apartments in Lewistown, Pennsylvania on August 2, 2016. He knew Koch[,] whom he was good friends with[,] and [he] dated Kelly McTavish at this time. Moore further testified [that,] other than arthritis[,] his health was fine, he wasn't confined to or required to use a wheelchair, he could ambulate, he suffered from no paralysis, he had control of his bladder and bowels, his sexual organs worked properly[,] and he lived independently at that point in time. Since August 2, 2016, Moore testified that he has resided either in hospitals or nursing homes. Moore further testified he can recall meeting [Appellant], along with Koch and McTavish[,] on August 2, 2016, however, other than lying on the floor at [Appellant's] house with [] [Appellant] yelling at him, he cannot recall any of the events that evening. Since the night of August 2, 2016, Moore testified he suffers from paralysis from the chest down, los[t] [the] of use of his hands, … is unable to ambulate, lost control of his bladder and bowels, lost the use of his sexual organ[s,] and … must be turned in bed every two hours. Moore further testified he has a pump implanted in his side[,] which injects medicine to his spine.

Trooper Michael Elder testified he interviewed [Appellant] at the Pennsylvania State Police barracks in Mifflintown, PA[,] around 8:00 AM on the morning of August 3, 2016. Trooper Michael Elder related the only injuries he observed to [Appellant] was a laceration to his lip and to his hand. No other bruising, swelling or severe cuts were noted by Trooper Elder.

Commonwealth's Brief at 1-5 (citations to the record omitted).

Appellant also took the stand in his own defense at trial. He testified consistently with the above-discussed witnesses regarding how he, McTavish, Koch, and Moore met at a bar and then proceeded to Appellant's home. ***See*** N.T. Trial, 7/18/17, at 163-68. However, his testimony differed drastically concerning what occurred at his home. Appellant summarizes his testimony about the altercation with Moore, as follows:

> At [Appellant's] house, everyone enjoyed some beers and the friends - but not [Appellant] - partook in smoking some substance. At some point the alleged victim, [] Moore, became aggravated and paranoid, perhaps because of the synthetic drug he appeared to have been smoking. Moore made a comment to [Appellant], threatening to beat him up if he "tried anything" with Kelly [McTavish], whom Moore identified as his "girl." [Appellant], upset at being talked to in this manner in his own home, then stood up and attempted to leave the room. Before he could do so, Moore grabbed his arm. [Appellant] moved toward the front door, intending to "throw him out the door and say everybody has to [...] leave." Before he could reach the door, Moore shoved [Appellant] through a large window. [Appellant] suffered a severe laceration to his arm and had significant blood loss. After this initial assault, [Appellant] pulled himself back into his home and continued to be assaulted by Moore. The parties exchanged blows, and Moore struck [Appellant] with a television remote control. [Appellant] then punched and kicked Moore repeatedly. Each time [Appellant] believed the fight was over, Moore would come back. Eventually, Moore lost consciousness. [Appellant] wanted to call an ambulance for Moore, but the other members of the party, Kelly [McTavish] and Patricia [Koch], wanted to take him to the hospital in their car. [Appellant] helped carry Moore to the car and loaded him into the back seat. Still unsure if the fight was truly over, [Appellant] pulled out a pocket knife he keeps on him all the time. The knife was never used as Moore did not resume fighting with [Appellant].
>
> [Appellant] then consumed several additional beers and passed out on the sofa from a combination of alcohol, adrenaline, and blood loss. He awoke the next morning to two Pennsylvania State Troopers at his door, yelling at him and pointing a taser and

pistol at him. [Appellant] surrendered without incident and was arrested and charged with the aforementioned charges.

Appellant's Brief at 11-13 (citations to the record omitted).

At the close of Appellant's trial, the jury convicted him of two counts of aggravated assault and one count of simple assault. Appellant's original sentencing hearing was conducted on September 14, 2017. At the close thereof, he was sentenced to a term of 7 to 20 years' incarceration for count 1 of aggravated assault, and a consecutive term of 2½ to 10 years' incarceration for count 2 of that offense. The court also imposed a concurrent term of 3 to 12 months' incarceration for Appellant's simple assault conviction.

Appellant filed a timely post-sentence motion. On February 5, 2018, the court entered an amended sentencing order that eliminated Appellant's simple assault sentence, as it merged with his sentence on count 1. Appellant's sentences for both aggravated assault counts remained the same. In regard to Appellant's other claims in the post-sentence motion, the court issued an order denying them that same day.

Appellant filed a timely notice of appeal, and he also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. In lieu of a Rule 1925(a) opinion, the trial court relied on an opinion it issued on February 5, 2018, in support of its partial denial of Appellant's post-sentence motion.

Herein, Appellant presents the following questions for our review:

1. Whether the trial court erred and/or abused its discretion when it imposed a sentence at the top of the Aggravated Range of the applicable sentencing guidelines, where it improperly

applied the sentencing guidelines by not clearly articulating legally correct and sufficient reasons for imposing sentences beyond the Standard Range of said guidelines?

2. Whether the trial court erred and abused its discretion by refusing to give [Appellant's] requested jury instruction on Justification or self-defense and defense of property (the Castle Doctrine), and on the use of deadly force?

3. Whether [Appellant] was denied his right to a fair trial before an impartial jury, as guaranteed to him by the 6th and 14th Amendments to the U.S. Constitution and by Article 1, Section 9 of the Pennsylvania Constitution; to present evidence and confront the evidence and witnesses against him (U.S. Const., Amend. 6 and 14; Pa. Const. Art 1, Sec. 9); to Due Process of Law (U.S. Const, Amend. 5 and 14; Pa. Const. Art 1, Secs. 1 and 9); and to Equal Protection of Law (U.S. Const. Amend. 14; Pa. Const. Art. 1, Sec. 9); and was denied his substantive and procedural rights under the statutes of Pennsylvania and under the Pennsylvania Rules of Criminal Procedure, in that:

a. The trial court refused to give [Appellant's] requested instruction to jury on self-defense and defense of property (Castle Doctrine);

b. The trial court refused to grant [Appellant's] request for testing of blood samples, or additional time to procure testing of the same?

4. Whether the Commonwealth improperly withheld exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), where it failed to supply defense with prior criminal records for the Commonwealth's fact witnesses?

Appellant's Brief at 7-8.

Appellant first challenges the discretionary aspects of his sentence.

Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. *Commonwealth v. Sierra*, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

We conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, *see*

- 6 -

Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. *Commonwealth v. Mann*, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, 574 Pa. 759, 831 A.2d 599 (2003).

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. *Commonwealth v. Paul*, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Sierra, supra* at 912–13.

*Commonwealth v. Griffin*, 65 A.3d 932, 935 (Pa. Super. 2013) (quoting

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010)).

In this case, Appellant filed a timely post-sentence motion in which he preserved his sentencing claims for our review. He also filed a timely notice of appeal and has included in his brief a Rule 2119(f) statement. Therein, Appellant contends that the court failed to state sufficient reasons for imposing "a sentence at the top of the aggravated range."[1] Appellant's Brief at 17. We

---

[1] Appellant also asserts that the court did not state sufficient reasons for imposing consecutive sentences, and that the court focused exclusively on the seriousness of his offense without considering other "relevant criteria." Appellant's Brief at 17. However, in the Argument section of his brief,

agree with Appellant that this claim constitutes a substantial question for our review. *See Commonwealth v. Ritchey*, 779 A.2d 1183, 1186 (Pa. Super. 2001) (concluding that "claims that the sentencing court provided insufficient reasons for the sentence imposed" constitute a substantial question).

Nevertheless, we conclude that Appellant's argument does not demonstrate an abuse of discretion by the trial court in fashioning his sentence. *See id.* at 1185 ("[S]entencing is a matter vested in the sound discretion of the sentencing judge, whose judgment will not be disturbed absent an abuse of discretion."). At the sentencing proceeding, the court offered the following explanation for imposing aggravated-range sentences:

> THE COURT: … In light of what I heard at trial and the condition of the victim here -- I mean, he can't walk away from this, and you [Appellant] have been convicted by a jury of your peers. The impact on the victim's life goes without saying. More or less his active life is over. I haven't heard any remorse. Of course, you are denying that you did this.
>
> [Appellant:] I'd like to add, Your Honor, that, you know, I never was given any prior medical history. This guy had degenerative bone disease, all that kind of stuff.
>
> THE COURT: [Appellant's] rehabilitative needs are an issue and obviously the horrific circumstances surrounding the offense that the jury found him guilty of. So this is in the aggravated range….

N.T. Sentencing, 9/14/17, at 18.

Appellant seemingly believes that, because the court's explanation was short, it was insufficient to support his aggravated-range sentence. We

---

Appellant does not develop either of these claims. Therefore, we will not address them.

disagree. In **Commonwealth v. Fullin**, 892 A.2d 843, 850 (Pa. Super. 2006), we concluded that a *single sentence* by the trial court was enough to justify an aggravated range sentence. There, the court stated that its sentence was premised on Fullin's "extreme indifference for the consequences of [his] actions" and "the extreme nature of the harm to the victim." **Id.**

Similarly, here, the trial court emphasized Appellant's lack of remorse for his actions, and the severe injuries he inflicted upon Moore. Appellant makes no argument that he exhibited remorse, or that the impact of his crimes on Moore were not extreme. **See id.** (noting that Fullin "makes no argument that the circumstances of [his] case are not in fact 'extreme'"). Indeed, Appellant placed his lack of remorse on full display when he interrupted the court's sentencing statement to blame Moore's 'degenerative bone disease' for the injuries that Appellant caused him. Additionally, just after Moore made an impact statement detailing his "life-changing" injuries, Appellant used his right to allocution to deny fault, list the various ways in which he was denied a fair trial, and detail how he and his family have been negatively impacted by this incident. **See** N.T. Sentencing at 9-18. Never once during his lengthy statement did Appellant express any sorrow for the injuries sustained by Moore, which are unquestionably devastating. Clearly, this record supports the trial court's reasons for imposing an aggravated range sentence, and our decision in **Fullin** convinces us that the court's explanation for that sentence, although short, was sufficient. Thus, Appellant's first issue is meritless.

Appellant next contends that the trial court erred by refusing to instruct the jury on self-defense or 'justification.'[2] We need not spend significant time on this claim, as our review of the record reveals that the court *did* instruct the jury on these legal concepts. ***See*** N.T. Trial, 7/18/17, at 246-48. Appellant does not even acknowledge the court's instruction, let alone offer any argument that it was inadequate. Moreover, even if he did, Appellant did not lodge a specific objection or exception to the court's charge, thus waiving any challenge thereto. ***See Commonwealth v. Baker***, 963 A.2d 495, 506 (Pa. Super. 2008) ("[U]nder Criminal Procedure Rules 603 and 647(B), the mere submission and subsequent denial of proposed points for charge that are inconsistent with or omitted from the instructions actually given will not suffice to preserve an issue, absent a specific objection or exception to the charge or the trial court's ruling respecting the points.").

In his third issue, Appellant argues that the trial court abused its discretion by refusing his pretrial request for the appointment of an expert "to evaluate blood sample evidence found at the scene." Appellant's Brief at 31. According to Appellant, his "injuries formed the basis of his Justification defense, and their very existence was denied by the Commonwealth. In order to substantiate that he was an injured party, [Appellant] sought to have the

---

[2] In Appellant's Statement of the Questions, he also mentions the court's failure to provide a jury instruction on the "defense of property (the Castle Doctrine), and on the use of deadly force[.]" Appellant's Brief at 7. However, Appellant does not develop any argument on these claims in the body of his brief. Consequently, we will not address them.

samples taken from his home tested to determine if the blood was his, []

Moore's, or a combination of both." *Id.* at 32. Appellant claims that "[s]uch

specific, scientific evidence could not have been replicated through any other

means because anyone else's testimony would be coming from someone with

a vested or other specific interest in the outcome of the trial." *Id.* Thus,

Appellant contends that there is no support in the record for the trial court's

determination that evidence of his injuries was "capable of being produced by

adequate alternative means." Trial Court Opinion, 7/12/17, at 2.

> Initially, this Court has explained:
>
> Under the law of Pennsylvania, as in a majority of states, the appointment of an expert witness or an investigator to assist in the preparation of a defense is vested in the sound discretion of the trial court…. [footnote omitted].
>
> Generally, the trial court will not be found to have abused its discretion in the absence of a clear showing as to the content, relevancy and materiality of the testimony of the potential witnesses.
>
> \*\*\*
>
> Neither the federal constitution nor our state constitution mandates that an expert be appointed at the public's expense to assist a defendant in the preparation of a defense.

*Commonwealth v. Bell*, 706 A.2d 855, 862 (Pa. Super. 1998) (internal

citations omitted).

Contrary to Appellant's claim, the record supports the trial court's

determination that evidence of his injuries could be produced by means other

than an expert to test the blood samples taken from Appellant's home. For

instance, Appellant testified that he was injured when Moore pushed him

through a window and struck him in the face with a television remote control. *See* N.T. Trial at 173-74, 175. Trooper Elder testified that on the morning after the incident, he spoke with Appellant, who claimed that Moore attacked him in his home, struck him in the face with a television remote, and pushed him through a window. *Id.* at 145. Appellant told Trooper Elder that he "sustained a cut" when he was pushed through the window, *id.*, and the trooper observed that Appellant had a "laceration on his lip" and "a laceration on his hand[,]" *id.* at 146. The trooper also testified that a window in the foyer area was broken and there was blood on the floor. *Id.* at 148. In addition to this testimony, the defense admitted into evidence photographs of Appellant's injuries that were taken by the police on the morning after the incident. *Id.* at 154. Those pictures, which were published to the jury, showed small lacerations on Appellant's hands, a larger cut on his forearm, and a cut on his lip. *See* Defendant's Exhibits 5 and 6. This evidence supports the court's conclusion that Appellant could prove that he sustained injuries by means other than the appointment of an expert to analyze blood samples taken from his home. Consequently, Appellant has not proven that the court abused its discretion.[3]

_____

[3] We are also unconvinced that testing of the blood samples would have changed the outcome of Appellant's trial. Again, the jury heard testimony and observed photographs that supported Appellant's claim that he was injured in the incident. However, it also heard testimony from two eyewitnesses - McTavish and Koch - who claimed that Appellant was the initial aggressor, and that he repeatedly stomped and kicked Moore in the head while Moore lay

Lastly, Appellant claims that the Commonwealth committed a **Brady** violation by not turning over, pursuant to his discovery request, the criminal records of Moore, Koch, and McTavish.  Before addressing Appellant's specific arguments, we recognize that

> [i]n **Brady**, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." **Brady supra** at 87, 83 S.Ct. 1194.
>
> This Court has held that "to prove a **Brady** violation, the defendant must show that: (1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression prejudiced the defendant." **Commonwealth v. Pagan**, 597 Pa. 69, 950 A.2d 270, 291 (2008) (citing **Commonwealth v. Carson**, 590 Pa. 501, 913 A.2d 220, 245 (2006)).
>
> **Commonwealth v. Busanet**, 54 A.3d 35, 48 (Pa. 2012). "**Brady's** mandate is not limited to pure exculpatory evidence; impeachment evidence also falls within **Brady's** parameters and therefore must be disclosed by prosecutors. **U.S. v. Bagley**, 473 U.S. 667, 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)." **Commonwealth v. Haskins**, 2012 PA Super 223, 60 A.3d 538, 546, 2012 WL 4841446, (Pa. Super. 2012). "The burden rests with Appellant to '**prove, by reference to the record**, that evidence was withheld or suppressed by the prosecution.' **Commonwealth**

---

defenseless on the floor.  The fact that Moore was left paralyzed from the chest down aligned more with McTavish's and Koch's description of the attack than Appellant's testimony that he and Moore had a "wrestling match[,]" **see** N.T. Trial at 173, and two instances of "exchanging … blows," **id.** at 175, after which Moore fell to the ground and Appellant "kicked him twice in the ribs[,] once on each side[,]" **id.** at 176.  Given this record, we cannot conclude that the jury's verdict would have changed had it been presented with evidence that blood at the scene was Appellant's.

*v. Porter,* 556 Pa. 301, 728 A.2d 890, 898 (1999) (citations omitted) (emphasis added)." ***Commonwealth v. Sneed*,** 45 A.3d 1096, 1116 (Pa. 2012).

***Commonwealth v. Nero*,** 58 A.3d 802, 809–10 (Pa. Super. 2012).

In this case, Appellant argues that the Commonwealth violated ***Brady*** by failing to turn over criminal information regarding Moore, Koch, and McTavish. More specifically, Appellant states that he knew McTavish was "out on bail for some offense" when the incident occurred, but the Commonwealth did not turn over her criminal record to reveal her pending charges. Appellant's Brief at 36. Thus, while Appellant was permitted to cross-examine McTavish about being on bail at the time of the incident, "[t]he court did not permit him to get into what she was on bail for." ***Id.*** Appellant maintains that if he had the criminal records of McTavish and the other Commonwealth witnesses, his "counsel would have identified potential and likely bias, incentive to testify favorably for the Commonwealth, and the various witnesses' hopes for leniency in other criminal matters. He could have then argued these reasons when the Commonwealth objected to his line of questioning while impeaching [McTavish]." ***Id.***

In support of his claim that criminal records must be turned over pursuant to ***Brady***, Appellant primarily relies on this Court's decision in ***Commonwealth v. Copeland***, 723 A.2d 1049, 1051 (Pa. Super. 1998). However, ***Copeland*** did not specifically address whether the Commonwealth is required to turn over criminal records pursuant to ***Brady***; instead, the ***Copeland*** panel ruled on the distinct issue of "whether the Commonwealth is

*precluded* by law from supplying to the defense the criminal histories of the prosecution's witnesses" under the Criminal History Record Information Act, 42 Pa.C.S. § 9121(b) (hereinafter, "the CHRIA") (emphasis added). Therefore, **Copeland** is not on point.

Instead, we find our Supreme Court's decision in **Commonwealth v. Tharp**, 101 A.3d 736 (Pa. 2014), to be dispositive of Appellant's argument. There, Tharp contended that the Commonwealth violated **Brady** by not turning over the criminal records of certain witnesses. **Tharp**, 101 A.3d at 752. However, our Supreme Court concluded that Tharp's "allegations relating to the suppression of … criminal records fail as they could have been obtained by subpoena from non-governmental sources." **Id.** at 752 (citing **Commonwealth v. Spotz**, 896 A.2d 1191, 1248 (Pa. 2006) ("It is well established that no **Brady** violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence.")). Likewise, the Court also rejected Tharp's claim that the Commonwealth committed a **Brady** violation by not disclosing that one witness was on parole when she testified against Tharp, reasoning that such information was a "matter of public record, readily obtainable by the defense from non-governmental sources." **Id.** at 753.

Here, Appellant admits that he knew, prior to trial, that McTavish had pending criminal charges for which she was on bail at the time of the incident. As discussed in **Copeland**, the CHRIA allows an individual to request criminal records from state and local police departments for a fee. Appellant does not

- 15 -

explain why he could not have utilized the CHRIA, or some other means, to obtain McTavish's criminal record, or the alleged criminal records of Koch and Moore. Accordingly, given **Tharp's** holding that such records are public and ascertainable by the defense, and Appellant's failure to explain why the records he sought were unobtainable with reasonable diligence, we conclude that **Brady** was not violated in this case.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/17/2018