J-S44006-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DOMINIC SOUTO DIAZ | : | |
| | : | |
| Appellant | : | No. 841 WDA 2018 |

Appeal from the PCRA Order May 16, 2018
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0003451-2014

BEFORE:  SHOGAN, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.:                    **FILED DECEMBER 20, 2019**

Appellant, Dominic Souto Diaz, appeals *pro se* from the order denying his petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.  We affirm.

The PCRA court set forth the following thorough recitation of the factual and procedural history of this case:

> On August 23, 2014, Appellant shot and killed bouncer, Hercules Rieger, outside The Bearded Lady, a bar at East 11th and Wayne Streets in Erie, Pennsylvania.  A neighborhood resident, Javon Martin, testified that he knew both Appellant and Rieger and heard them arguing near the entrance of the bar.  N.T., 5/12/15, (Day 2), at 53, 58, 65.  Martin also testified that he saw Rieger punch Appellant.  N.T., 5/12/15, at 59.  Appellant left the scene but returned shortly thereafter.  *Id*. at 60-63.  Martin said he saw Appellant pull a gun from his waistband and shoot Reiger.  *Id*.
>
> Another neighborhood resident, Jamie Barlorin, testified that he saw and heard two men arguing.  He later identified the men from a photographic array as Appellant and another Bearded Lady bouncer, Marzell Stovall.  *Id*. at 116.  Barlorin testified he

saw Stovall strike Appellant in the head with a tire iron. Barlorin heard a gunshot approximately twenty minutes later and he called 911 at approximately 2:46 a.m. *Id*. at 117, 120, 124.

Joino McAdory was also working as a bouncer at The Bearded Lady. He confirmed the physical altercation between Rieger and Appellant in which Reiger [sic] punched Appellant and knocked him down. N.T., 5/13/15, (Day 3), at 38-39. McAdory testified that ten to fifteen minutes later, he heard a gunshot and saw Rieger fall to the ground. He did not see who fired the shot. *Id*. at 40.

Raymond MacDonald, a senior manager of the law enforcement management group for T-Mobile, verified that Appellant made calls on his cell phone just before he was arrested. MacDonald testified that those calls placed Appellant in the vicinity of the murder. N.T. (Day 3), at 3-4, 35-36. Appellant tried to destroy his cell phone while sitting in the back of the police cruiser immediately after he was arrested. N.T. (Day 3), at 99.

Appellant offered an expert who offered a contrary opinion regarding the interpretation of the cell phone records. Louis Cinquanto testified that the phone records placed Appellant anywhere from .84 to 2.75 miles from the scene at the time of the shooting. N.T. (Day 3) at 84.

Appellant's trial counsel, Attorney Bruce Sandmeyer, attempted to discredit the eyewitness testimony of Javon Martin, the neighbor who claimed he saw Appellant shoot the victim. After he observed the incident at The Bearded Lady, Martin was jailed on a parole violation. Martin's jail mates testified at trial that Martin told them Appellant was not at the scene of the crime and that Martin was just testifying against Appellant in order to get lenient treatment in his own case. N.T. (Day 3), at 52; N.T. (Day 2), at 77.

At trial, the prosecution was forthright about the fact that they helped Martin in his revocation hearing after he provided his statement to the police identifying Diaz as the murderer. However, the prosecution maintained that Martin was not promised anything *before* he gave his statement to the police. Martin was asked about his lenient treatment by [Assistant District Attorney Erin] Connelly, on direct and by defense counsel on cross examination. N.T. (Day 2) at 71, N.T. (Day 2) at 77. During

- 2 -

discovery, the prosecution provided the defense with a letter from Martin to Connelly asking for lenient treatment after he made his statement to police. On cross examination, Defense counsel used that letter to discredit Martin as a snitch. N.T. (Day 2) at 78-79. There is no evidence of any other favors or lenient treatment promised to Martin at any time. In fact, after Attorney Connelly vouched for Martin at his Revocation Hearing, Martin was released on parole, but promptly absconded to Tennessee. He was later found and returned to prison to finish serving his term. Connelly made it clear that no further favors would be granted to him, even if he testified at the Diaz trial. Connelly emphasized this fact in her closing argument.

On May 14, 2015, a jury returned a guilty verdict against Appellant on all counts: first-degree murder, aggravated assault, recklessly endanger[ing] another person, possessing an instrument of crime, and firearms not be carried without a license. Appellant filed post-trial motions, which were denied by the Honorable Ernest DiSantis on July 17, 2015. Appellant filed a timely appeal to the Pennsylvania Superior Court, which was denied on June 24, 2016. [**Commonwealth v. Diaz**, 153 A.3d 1118, 1257 WDA 2015 (Pa. Super. filed June 24, 2016) (unpublished memorandum)].

Between June 8 and June 12, 2017, Appellant filed the instant timely *pro se* PCRA claim, raising 17 issues.[1] Counsel was appointed and filed a Supplemental Motion in support of Appellant's PCRA claims on September 19, 2017. The counseled Supplemental Petition "incorporate[s]" all of Appellant's claims raised in his *pro se* petition[2] and more specifically addresses two of the previously raised issues: (1) ADA Connelly committed prosecutorial misconduct by not revealing that the DA's office offered Martin significant favorable treatment in exchange for his testimony against Appellant; and (2) Appellant's counsel was ineffective for failing to call two exculpatory witnesses: Attila Diaz and Valentino Moore who were with Martin the night of the murder. (Supplement to Motion for Post Conviction Collateral Relief, 9/19/17).

[1] Pursuant to the prisoner mailbox rule, Appellant's *pro se* PCRA filing is the date he placed it in the hands of prison authorities for mailing (i.e. postmark date). *See, Commonwealth v. Fransen*, 986 A.2d 154, 156 n.5 (Pa. Super. 2009); **Commonwealth v.**

- 3 -

*Castro*, 766 A.2d 1283 (Pa. Super. 2001); *Commonwealth v. Little*, 716 A.2d 1287 (Pa. Super. 1998). Here, Appellant's Certificate of Service is dated June 8, 2017 and his Petition is docketed June 12, 2017, but we lack evidence of when Appellant placed his petition in the hands of the postal authorities. However, pursuant to either date, the Petition is timely.

[2] *Commonwealth v. Cherry*, 155 A.3d 1080, 1083 (Pa. Super. 2017) (PCRA counsel's duty is to amend a *pro se* petition and present it in legal terms or certify that the claims lack merit).

On September 25, 2017[,] Appellant mailed to the [c]ourt, but failed to file with the Clerk or copy his counsel, a "Request to Proceed *pro se*, for the Post Conviction Relief and for Attorney Hathaway to withdraw and to amend the PCRA." Appellant claimed that Attorney Hathaway "failed to argue issues with merit." At the same time, Appellant also mailed the [c]ourt a 27 page "Amendment to the Supplement for Post Conviction Relief," which was forwarded to [Appellant's] counsel, Attorney William Hathaway. On December 21, 2017, a *pro se* colloquy was conducted and it was determined that Appellant wanted Attorney Hathaway to continue to represent him. Attorney Hathaway declined to submit an amended supplemental petition based on Appellant's *pro se* Amendments.

On February 15, 2018, Appellant wrote the [c]ourt a letter indicating, once again, that he wanted to proceed *pro se*. On March 27, 2018, Attorney Hathaway filed a Petition for Leave to Withdraw as Counsel, which was denied. The [c]ourt also denied Appellant's request to proceed *pro se*, as having already been determined at the December 21, 2017 *Grazier* hearing.[3]

[3] *Commonwealth v. Grazier*, 713 A.2d 81, 82 (Pa. 1998) (citations omitted) ("When a waiver of the right to counsel is sought at the post-conviction and appellate stages, an on-the-record determination should be made that the waiver is a knowing, intelligent, and voluntary one.")

Prior to the evidentiary hearing, Attorney Hathaway filed a Motion to Recuse, based on the fact that this [c]ourt's former law

clerk, Brandon Bingle, Esq., who assisted Attorney Connelly in prosecuting [Appellant]. The Motion to Recuse was denied on April 30, 2018. Attorney Hathaway also filed a Motion for Discovery of information relating to the favorable treatment of Martin, which was granted on the same date.

On May 11, 2018, this [c]ourt conducted an evidentiary hearing to address the merits of Appellant's PCRA claims. At the hearing, Appellant testified on his own behalf. Appellant's alleged alibi witnesses, Valentino Moore and Attila Diaz, also testified. Witnesses for the Commonwealth included former Assistant District Attorney, Brandon Bingle, Esq., Assistant District Attorney, Erin Connelly, Esq., trial counsel, Bruce Sandmeyer, Esq., and the Public Defender's private investigator, Laurie Rogan, M.S. At the evidentiary hearing, PCRA counsel pursued the following issues: (1) whether trial counsel should have called two alibi witnesses; (2) whether the prosecution committed a ***Brady*** violation; and an additional claim which did appear in Appellant's *pro se* Petition, (3) trial counsel was ineffective for "failing to object to DA's closing statement regarding the location of [Appellant's] cell phone near the crime scene at the time of the murder." (*pro se* PCRA Petition, ¶6(C)(3)).

On May 16, 2018, this [c]ourt issued a Final Order dismissing Appellant's PCRA Petition in light of the evidence received during the evidentiary hearing, and upon an independent review of the record. On June 1, 2018, Appellant filed a *pro se* Notice of Appeal, although still represented by counsel. On June 5, 2018, this [c]ourt recognized Appellant's *pro se* Appeal as an exception to the bar against hybrid representation.[4] We issued a 1925(b) Order requiring a Concise Statement within twenty-one days. On June 18, 2018 Appellant filed a Concise Statement of Matters Complained of on Appeal, raising 29 issues for appellate consideration. Appellant made it known that he wanted to proceed pro se on appeal. A ***Grazier*** hearing was scheduled. PCRA counsel filed a written Motion to Withdraw as Counsel. A ***Grazier*** hearing was held on June 29, 2018, in which it was determined that Appellant knowingly, intelligently, and voluntarily chose to proceed pro se on appeal. The [c]ourt granted Attorney Hathaway's Petition for Leave to Withdraw as Counsel.

[4] ***See Commonwealth v. Williams***, 151 A.3d 621 (Pa. Super. 2016).

- 5 -

Appellant then filed a flurry of pro se Motions requesting, *inter alia*, discovery, transportation to a different holding facility, requests for extension of time, a motion to quash his first Concise Statement, and a request to file an Amended Concise Statement. Most of these motions were denied. On August 8, 2018, the Pennsylvania Superior Court remanded this case in order to allow Appellant to file an Amended Concise Statement within 14 days. Appellant timely complied. On August 22, 2018, Appellant filed an Amended Statement of Matters Complained of on Appeal raising 15 issues, some but not all of which overlap with the 29 issues raised in Appellant's original Concise Statement. Several issues in the Concise Statements are newly raised and cannot be discerned in any of Appellant's prior filings.

PCRA Court Opinion, 9/10/18, at 1-6.

Appellant presents the following issues for our review, which we reproduce *verbatim*:

I. Trial counsel was ineffective for not objecting to the Commonwealth improper remarks misrepresenting and putting on false evidence in opening and closing arguments in violation of Appellants 6th and 14th Amendment.

II. The trial court erred when it dismissed Appellant PCRA petition alleging the Commonwealth failed to turn over discovery information pursuant to Brady v. Maryland[1] in violation of Appellant fourteenth Amendment right to due process

Appellant's Brief at 5.

When reviewing the propriety of an order denying PCRA relief, we consider the record "in the light most favorable to the prevailing party at the PCRA level." *Commonwealth v. Stultz*, 114 A.3d 865, 872 (Pa. Super. 2015) (quoting *Commonwealth v. Henkel*, 90 A.3d 16, 20 (Pa. Super. 2014)

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

(*en banc*)).  This Court is limited to determining whether the evidence of record supports the conclusions of the PCRA court and whether the ruling is free of legal error.  ***Commonwealth v. Rykard***, 55 A.3d 1177, 1183 (Pa. Super. 2012).  We grant great deference to the PCRA court's findings that are supported in the record and will not disturb them unless they have no support in the certified record.  ***Commonwealth v. Rigg***, 84 A.3d 1080, 1084 (Pa. Super. 2014).

In the argument portion of his brief, Appellant challenges the effective assistance of his prior counsel.  Our Supreme Court has long stated that, in order to succeed on a claim of ineffective assistance of counsel, an appellant must demonstrate: (1) the underlying claim is of arguable merit; (2) counsel's performance lacked a reasonable basis; and (3) the ineffectiveness of counsel caused the appellant prejudice.  ***Commonwealth v. Pierce***, 786 A.2d 203, 213 (Pa. 2001).

We observe that claims of ineffective assistance of counsel are not self-proving.  ***Commonwealth v. Wharton***, 811 A.2d 978, 986 (Pa. 2002).  In addition, we note that where an appellant is not entitled to relief with regard to the underlying claim upon which his ineffectiveness claim is premised, he is not entitled to relief with regard to his ineffectiveness claim. ***Commonwealth v. Ousley***, 21 A.3d 1238, 1246 (Pa. Super. 2011).  Thus, trial counsel cannot be deemed ineffective for failing to pursue a meritless

claim. ***Commonwealth v. Loner***, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*).

Moreover, with regard to the second prong, we have reiterated that trial counsel's approach must be "so unreasonable that no competent lawyer would have chosen it." ***Commonwealth v. Ervin***, 766 A.2d 859, 862-863 (Pa. Super. 2000) (quoting ***Commonwealth v. Miller***, 431 A.2d 233 (Pa. 1981)).

Our Supreme Court has discussed "reasonableness" as follows:

> Our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had *some reasonable* basis designed to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis.

***Commonwealth v. Pierce***, 527 A.2d 973, 975 (Pa. 1987) (quoting ***Commonwealth ex rel. Washington v. Maroney***, 235 A.2d 349 (Pa. 1967)) (emphasis in original).

In addition, we are mindful that prejudice requires proof that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. ***Pierce***, 786 A.2d at 213. "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." ***Commonwealth v. Daniels***, 963 A.2d 409, 419 (Pa. 2009) (citing ***Commonwealth v. Sneed***, 899 A.2d 1067 (Pa. 2006)). Thus, when it is clear that a petitioner has failed to meet the prejudice prong of an

ineffective-assistance-of-counsel claim, the claim may be disposed of on that basis alone, without a determination of whether the first two prongs have been met. *Commonwealth v. Baker*, 880 A.2d 654, 656 (Pa. Super. 2005).

Further, it is presumed that the petitioner's counsel was effective, unless the petitioner proves otherwise. *Commonwealth v. Williams*, 732 A.2d 1167, 1177 (Pa. 1999). Moreover, we are bound by the PCRA court's credibility determinations where there is support for them in the record. *Commonwealth v. Battle*, 883 A.2d 641, 648 (Pa. Super. 2005) (citing *Commonwealth v. Abu-Jamal*, 720 A.2d 79 (Pa. 1998)).

Appellant first argues that the PCRA court erred in failing to determine that his trial counsel was ineffective. Appellant's Brief at 15-28. Specifically, Appellant asserts that trial counsel erred in failing to object to the Commonwealth's improper argument during closing arguments. *Id*. at 17-27. Appellant contends that the prosecutor misrepresented to the jury evidence offered by expert witnesses regarding Appellant's physical location, at the time of the murder, through the use of cell phone technology.

A prosecutor is allowed wide latitude in advocating for the Commonwealth, including the right to argue all fair deductions from the evidence, to respond to defense arguments, and to engage in a certain degree of oratorical flair. *Commonwealth v. Judy*, 978 A.2d 1015, 1020 (Pa. 2009). In addition, we are mindful of the following:

> A claim of ineffective assistance grounded in trial counsel's
> failure to object to a prosecutor's conduct may succeed when the

petitioner demonstrates that the prosecutor's actions violated a constitutionally or statutorily protected right, such as the Fifth Amendment privilege against compulsory self-incrimination or the Sixth Amendment right to a fair trial, or a constitutional interest such as due process. To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. The touchstone is fairness of the trial, not the culpability of the prosecutor.

We further reiterate that a prosecutor has reasonable latitude during his closing argument to advocate his case, respond to arguments of opposing counsel, and fairly present the Commonwealth's version of the evidence to the jury. The court must evaluate a prosecutor's challenged statement in the context in which it was made. Finally, [n]ot every intemperate or improper remark mandates the granting of a new trial; [r]eversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

*Commonwealth v. Hanible*, 30 A.3d 426, 464-465 (Pa. 2011) (quotation marks and citations omitted).

In addressing this claim of ineffective assistance, the PCRA court offered the following analysis:

[Appellant] claims … that [trial counsel] was ineffective for failing to object to [the prosecutor's] alleged misrepresentation of the cell phone testimony during her closing argument. This claim … lacks merit since the Commonwealth's expert and [Appellant's] experts presented conflicting testimony about where [Appellant] was located when various cell phone calls were made at times close to the murder. The Commonwealth's expert claimed that the phone calls showed that [Appellant] was near the scene of the murder. [Appellant's] expert claimed that the calls showed [Appellant] was on the other side of town at the time of the murder. [The prosecutor] chose to re-iterate her expert's version of the cell phone expert testimony during her closing argument. (Ev. Hrg. Tr. p. 75-76). No objection was warranted. [Trial counsel] was then able to re-iterate the defense expert's

- 10 -

conclusions to the contrary during his closing argument. The fact that the jury believed the Commonwealth's expert over the defenses expert does not constitute ineffective assistance of counsel.

PCRA Court Opinion, 9/10/18, at 17-18. We agree that Appellant failed to demonstrate that the prosecutor's comments during closing argument violated a constitutionally or statutorily protected right.

The record reflects that the Commonwealth gave a twenty-three-page closing argument. N.T., 5/13/15, at 130-153. The following excerpt is the allegedly offensive comment made during the closing statement:

> So we back up to here. Here, ironically enough, is going to put us between that 2:35 and that 2:43 number before [Appellant] starts coming back this way. So we know that around the time the shot was fired, he's there. His phone is there. His phone is picking up that tower.

*Id*. at 140.

We do not agree with Appellant's conclusion that this statement by the prosecutor was an invalid reflection of the evidence presented at trial. Rather, our determination is supported by the following testimony offered by trial counsel during the PCRA court's evidentiary hearing:

> Q. So it's fair to say … that your defense was primarily predicated on the expert witness; is that correct?
>
> A. Absolutely. [The defense expert], just his testimony taking a very technical subject, he was able to break it down and discuss it in [l]ayman's terms. And what was so critical about his testimony was that he described each cell tower, how the cell tower works, you know, the grid coordinates that are on each cell tower, what that means in regards to whether the tower pinged from east, west, north, or south. And you know, I also had concerns about, you know, the information that [Appellant] had

- 11 -

given us because there were cell phone calls that were at least attributed to his phone that night and I was very concerned about what he was saying, those cell phone times, and the [the defense expert], how he had triangulated the phone calls. I was much more confident in [the defense expert].

Q. And again, this is not a precise science, it's not like a GPS where you can precisely place where the cell phone transmission was made from; is that correct?

A. That is correct, sir.

Q. It's basically where it pings off the nearest available tower; is that correct?

A. Yes, sir. There [are] some variables to that based on atmosphere, conditions, of course, the direction that the phone is pointed in, there are variables to that. But that is correct, sir.

Q. Were you fairly confident that your expert's testimony either exculpated [Appellant] or served to provide reasonable doubt in his guilt of the crime?

A. I did, sir.

Q. And it was to your benefit and advantage that you wanted the jury to be able to comprehend and fairly evaluate the expert testimony, both your expert and the Commonwealth's expert, is that correct?

A. Absolutely. The Commonwealth did call somebody from one of the cell phone companies and I thought [the defense expert] was far superior to his testimony.

Q. Do you have a recollection of [the prosecutor] making reference in her closing argument to the expert testimony, including your defense expert placing [Appellant] in the vicinity of The Bearded Lady at 2:42 a.m. in the morning?

A. Oh, if it's in the transcript I'm sure we both addressed the cell phone evidence extensively.

Q. Do you believe that statement was a good faith reference and supported in the evidentiary record that it did place [Appellant] on the east side at that time period?

A. Absolutely. The cell phone expert presented by the Commonwealth that would have definitely been supported by his testimony.

N.T., 5/11/18, at 70-72.

Upon review, it is our determination that the prosecutor's comment was an effort to present the Commonwealth's version of what the evidence established. Moreover, to the extent that we could conclude that the prosecutor's recap of the evidence was not an accurate reflection of the testimony presented at trial, it is our determination that the remark would not mandate a new trial. The passing comment by the prosecutor about where Appellant's cell phone was picking up on a particular tower did not have the unavoidable effect of prejudicing the jurors and forming in their minds a fixed bias and hostility toward Appellant such that they could not weigh the evidence and render a true verdict. Hence, there is no merit to Appellant's underlying argument that trial counsel was ineffective for failing to object during the closing argument. Accordingly, this claim of ineffective assistance lacks merit.

Appellant last argues that the PCRA court erred in concluding that his claim of ineffective assistance of counsel, with regard to an alleged **Brady** violation, lacked merit. Appellant's Brief at 29-49, and Appellant's Addendum to Brief at 1A-5A. Appellant contends that the Commonwealth violated the

provisions of **Brady** by failing to disclose an offer to the lone eyewitness for favorable treatment in his unrelated personal criminal matter in exchange for testimony at Appellant's trial.

This Court has summarized the law pertaining to **Brady** as follows:

> In **Brady**, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." **Brady supra** at 87, 83 S.Ct. 1194.
>
> This Court has held that "to prove a **Brady** violation, the defendant must show that: (1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression prejudiced the defendant." **Commonwealth v. Pagan**, 597 Pa. 69, 950 A.2d 270, 291 (2008) (citing **Commonwealth v. Carson**, 590 Pa. 501, 913 A.2d 220, 245 (2006)).

**Commonwealth v. Busanet**, 54 A.3d 35, 48 (Pa. 2012). "**Brady's** mandate is not limited to pure exculpatory evidence; impeachment evidence also falls within **Brady's** parameters and therefore must be disclosed by prosecutors. **U.S. v. Bagley**, 473 U.S. 667, 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)." **Commonwealth v. Haskins**, 2012 PA Super 223, 60 A.3d 538, 546, 2012 WL 4841446, *6 (Pa. Super. 2012). "The burden rests with Appellant to '**prove, by reference to the record,** that evidence was withheld or suppressed by the prosecution.' **Commonwealth v. Porter**, 556 Pa. 301, 728 A.2d 890, 898 (1999) (citations omitted) (emphasis added)." **Commonwealth v. Sneed**, 45 A.3d 1096, 1116 (Pa. 2012). "A witness's assumption that he will benefit from cooperating in the prosecution of the defendant, without more, is insufficient to establish that an agreement existed, and does not trigger **Brady** disclosure requirements." **Busanet, supra** at 49 (citation omitted).

**Commonwealth v. Nero**, 58 A.3d 802, 809-810 (Pa. Super. 2012).

- 14 -

Moreover, we observe that pretrial discovery in criminal cases is governed by Pa.R.Crim.P. 573. The rule lists certain items and information that are subject to mandatory disclosure by the Commonwealth when they are (1) requested by the defendant, (2) material to the case, and (3) within the possession or control of the prosecutor. Pa.R.Crim.P. 573(B). Mandatory discovery includes any evidence favorable to the accused that is material to either guilt or punishment. Pa.R.Crim.P. 573(B)(1)(a). As this Court has stated "[t]he law is clear that a criminal defendant is entitled to know about any information that may affect the reliability of the witnesses against him." **Commonwealth v. Copeland**, 723 A.2d 1049, 1051 (Pa. Super. 1998) (citing **Commonwealth v. Moose**, 602 A.2d 1265 (Pa. 1992)).

"A defendant seeking relief from a discovery violation must demonstrate prejudice. ... [He] must demonstrate how a more timely disclosure would have affected his trial strategy or how he was otherwise prejudiced by the alleged late disclosure." **Commonwealth v. Causey**, 833 A.2d 165, 171 (Pa. Super. 2003).

The PCRA court offered the following detailed discussion addressing Appellant's claim of ineffective assistance pertaining to the alleged **Brady** violation, which we adopt as our own:

Here, Appellant's claims ... all relate to trial counsel's failure (or PCRA counsel's failure to allege trial counsel's failure) to adequately challenge a purported *Brady* violation and/or prosecutorial misconduct concerning Javon Martin's receipt of favorable treatment in exchange for his trial testimony against [Appellant]. Martin was a key witness for the prosecution. At

- 15 -

trial, he identified Appellant as the shooter, but prior to trial he did not come forward with this information to police until he had been arrested on a bench warrant for his own parole/probation violation. The record reveals that Javon Martin did, in fact, receive favorable treatment in his parole revocation case in large part due to ADA Erin Connelly's intervention on his behalf.

However, the fact of Martin's deal with the prosecution was disclosed in discovery to the defense (PCRA Evidentiary Hearing Tr., p. 48-49) and openly admitted during Martin's direct and cross examinations. (See Trial Transcript, pp. 71-73, 77-78). In fact, on cross examination, Appellant's attorney used a letter from Martin to Connelly asking for assistance in his own criminal matter. That letter had been disclosed by Connelly prior to trial. (PCRA Ev. Hr. Tr. p., 49; Trial Tr. Day 2, pp. 78-79). The prosecution noted that they did not offer Martin assistance until AFTER he spoke with police. Only after Martin made statement to police, did Attorney Connelly go to bat for Martin at his subsequent revocation hearing, a fact which Attorney Connelly freely admitted while questioning Javon Martin at [Appellant's] murder trial:

> Q. [ATTORNEY CONNELLY]: And at some point you actually meet me at the police station that evening, correct?
>
> A. [JAVON MARTIN]: Yeah, after everything, after I made my statement.
>
> Q. After you've given your statement?
>
> A. Yeah:
>
> Q. And do I make you any promises about anything I can do to help you out?
>
> A. No.
>
> Q. After that, you go back into court for your revocation, correct?
>
> A. Yes.
>
> Q. All right. And I asked the judge to let you out of jail, right?

- 16 -

A. Yes.

Q. Did you know I was going to do that?

A. No.

(Trial Tr., Day 2, p. 71). The only observable issue in this exchange is not whether the prosecution revealed the fact they assisted Martin at his revocation hearing, which was made abundantly clear to the jury, but rather whether Martin had foreknowledge of that assistance. In the above exchange, Martin denies knowing that Connelly would show up at his revocation hearing. However, at Javon Martin's revocation hearing Attorney Connelly tells the revocation judge that after Martin made his statement to the police she told him that she "would come to bat for him" at his revocation hearing. ADA Connelly addressed the revocation [c]ourt as follows:

> **MS. CONNELLY**: Thank you, your Honor. You have the benefit of the revocation summary here, as well as the remarks by the Adult Probation officers.
>
> I'm actually familiar with Mr. Martin. He's helping me out with something big, and he has been very cooperative. He, in fact, upon being asked to help agreed to immediately before anything - before anyone offered him anything, and after the fact *I told him that I would come to bat for him in court here today*.
>
> I respect that probation had difficulty with him and that they couldn't - and that he didn't report immediately. I guess I would be taking a risk here going to bat for Mr. Martin, and he understands that, but I would ask that he be paroled for the remaining ten months of his sentence, that he continue to work, and that he be made to continue his cooperating with the Commonwealth as part of his probationary sentence.
>
> Mr. Martin, along with whatever is required by his probation officers, will also be coming to see me once a month to touch base.

> **THE COURT**: All right. Okay. Very well. And I read the letters that you did send me too.
>
> So at case number 65 of 2013, what I'll do is re-impose the sentence that was already given...

(Javon Revocation Hearing Transcript, 9/19/14, p. 7). Martin's original sentence was re–imposed and he was released on parole the next day. (Supplemental Petition, p. 5). He promptly absconded to Tennessee. He was found and returned to the Erie County Prison, where he remained to serve his sentence. N.T. (Day 3), p. 132-133. While serving the remainder of the revocation sentence, Martin testified at Appellant's murder trial in May of 2015.

In her closing argument, Attorney Connelly told the jury that Javon Martin [did not] know she was going to show up at his probation hearing and tell the judge that he should be released:

> **MS. CONNELLY**: ... We brought [Martin] over after we got his name and sat him down, were you there? Yea, I was there. What happened?
>
> And what does he do? He gave a video-taped statement to the police saying this is what happened, this is what I saw. And you know what, because he did that, I did to go the Court. He didn't know I was going to. I showed up at his probation hearing and I said, let him out, he's doing the right thing, let him out. He didn't know I was going today that. (sic) He didn't know how long he was sitting there. He didn't even know I was coming to his hearing. And we let him out.

N.T. (Day 3) at 132 (emphasis supplied). The question of when Martin knew Connelly would help him at his revocation hearing was addressed at the PCRA evidentiary hearing:

> Q. [ATTORNEY HATHAWAY]: Now, in the interim between when he was brought in on the detainer and his actual revocation proceeding, did you ever represent to Mr. Martin that you would appear on his behalf at the revocation?

A. [ATTORNEY CONNELLY]: No, I don't believe I had any conversations with Mr. Martin during that time frame. I don't recall, I guess I could say fairly I don't recall. I know he wasn't promised anything prior to giving his statement. At what point I told him, if I told him, which I don't believe I did that I would show up at his revocation, I don't believe I did. I believe I just went there and did that because he was doing the right thing.

(PCRA. Ev. Hr. Tr., pp. 45-46).

A claim brought under *Brady v. Maryland*, 373 U.S. 83 (1963), challenges the Commonwealth's failure to produce material evidence. Specifically, a *Brady* claim requires a petitioner to show "(1) the prosecutor has suppressed evidence, (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant, and (3) the suppression prejudiced the defendant." *Commonwealth v. Carson*, 913 A.2d 220, 244 (Pa. 2006). The record reveals no suppression of material evidence by the prosecution in this case. Furthermore, the evidence suppressed by the prosecutor must be material, such that there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different. *Commonwealth v. Burke*, 781 A.2d 1136, 1141 (2001).

Here, even had the jury known that ADA Connelly told Martin, after he provided his videotaped deposition to the police, but before his revocation hearing, that she would go to bat for him at his revocation hearing, it would not have made a substantial difference in the outcome of the trial. Therefore, we find that whether Attorney Connelly told Martin she would go to bat for him before or at his revocation hearing is a non-material issue. The important facts are that: (1) prior to trial Connelly fully disclosed her promise to help Martin at his revocation hearing; (2) at trial, Martin's deal with the prosecution was made known to the jury; and (3) Connelly did not promise Martin any help until after Martin made his statement to the police in which he identified [Appellant] as the shooter. Appellant's ... group of claims is therefore without merit.

PCRA Court Opinion, 9/10/18, at 9-12 (footnote omitted) (emphasis in original).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/20/2019